[Civ. No. 2556.   Third Appellate District.—December 30, 1922.]

## WILD GOOSE COUNTRY CLUB (a Corporation), Appellant, v. COUNTY OF BUTTE, Respondent.

[1] TAXATION — VALUATION OF LAND — GENERAL ADAPTABILITY. — In arriving at the value of land for the purposes of taxation it is proper to take into consideration every use to which it is naturally adapted and which will enhance its value in the estimation of persons generally, purchasing in the open market.

[2] ID.—PROCEEDING BEFORE BOARD OF EQUALIZATION—FAIRNESS OF ASSESSMENT — PRESUMPTION. — In a proceeding before a county board of equalization, an assessment is presumed to be fair, and in the absence of evidence tending to show the value of the complaining taxpayer's lands, or of other lands in the county, the premises are wanting from which a conclusion can be drawn of the existence of an inequality of assessments.

[3] ID.—INEQUALITY OF ASSESSMENTS—EVIDENCE.—Proof that one taxpayer's lands are assessed at a higher value than those of his neighbors does not justify the inference that there is any inequality in the assessments, in the absence of proof of the relative market values of the lands compared.

[4] ID. — ACTION FOR RECOVERY OF TAXES — ASSESSMENT NOT EXCESSIVE.—In this action to recover moneys paid under protest as taxes, the evidence supports the finding that the property was not assessed for more than its cash value.

[5] ID.—PROCEEDING BEFORE BOARD OF EQUALIZATION—VALUATION—PERSONAL KNOWLEDGE OF MEMBERS—ABSENCE OF PRESUMPTION.—In a proceeding before a county board of equalization for reduction of an assessment, it cannot be presumed, in the absence of

proof, that the members of the board had personal knowledge of the value of the complaining taxpayer's lands or of the surrounding lands at the time that the matter was presented.

[6] ID.—FAILURE TO INCREASE ASSESSMENTS OF ADJOINING LANDS—SHORTNESS OF TIME—ABSENCE OF FRAUD.—The failure of a county board of equalization to raise the assessment on surrounding lands when its attention was called to the inequality between such assessments and the complaining taxpayer's assessment did not constitute such a fraud as entitled such taxpayer to recover the taxes paid under protest, where the time was too short to raise the assessments for that year.

APPEAL from a judgment of the Superior Court of Butte County. J. F. Ellison, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

Lester J. Hinsdale, Butler & Van Dyke, Downey & Downey and Jos. L. Knowles for Appellant.

J. R. Robinson for Respondent.

FINCH, P. J.—Plaintiff brought this action to recover moneys paid under protest as taxes for the fiscal year commencing July 1, 1919, on the alleged ground that the assessment of its property was fraudulently excessive. The defendant was given judgment upholding the assessment and plaintiff appeals therefrom.

There was a general increase by the county assessor in the assessment of lands in Butte County in 1919. In that year, for the first time, the market value of lands for hunting purposes was taken into consideration in making assessments. The evidence covers a period of four years, during which the lands of plaintiff and those of an adjoining gun club were assessed at the following sums per acre: 1917 and 1918, $5; 1919 and 1920, $50. The assessments of other adjoining lands in 1917 and 1918 were from $4 to $6; in 1919, from $10 to $15; and in 1920, from $25 to $40.

July 5, 1919, the plaintiff filed its petition with the board of supervisors, sitting as a board of equalization, praying that the assessment of its lands be reduced to $10 an acre,

on the grounds that $10 an acre was the full cash value thereof and that other lands in the county of the same quality and similarly situated were assessed at $10 an acre, particularly three adjoining tracts. On the 29th of July, representatives of the plaintiff appeared before the board of equalization in support of the petition. No witnesses were sworn, but the attorney for plaintiff made a statement of the grievances complained of, pointed out the assessment of adjoining holdings, and stated that such lands "were much the same as a large portion" of plaintiff's land. For the purposes of this opinion, no significance will be given to the fact that the representatives of plaintiff were not sworn.

[1] Plaintiff's contention before the board and at the trial in the superior court was that its lands should have been classed as grazing land in making the assessment, without consideration of their market value as a hunting preserve. In arriving at the value of the land it was proper to take into consideration every use to which it was naturally adapted and which would enhance its value in the estimation of persons generally, purchasing in the open market. The question is not what its value is for a particular purpose, but its value in view of all the purposes to which it is naturally adapted. (*Sacramento etc. R. R. Co.* v. *Heilbron,* 156 Cal. 408 [104 Pac. 979]; *Yolo Water & Power Co.* v. *Hudson,* 182 Cal. 48 [186 Pac. 772].)

[2] The evidence shows without conflict, and the court found, that at the hearing before the board of equalization no evidence was presented or offered bearing upon the value of the plaintiff's lands or the value of any property in Butte County or tending to show that any property in the county was assessed at other than the full cash value thereof or that there was "any inequality of assessments between the said property owned by plaintiff and any other property in Butte County, or that the said assessment so placed upon plaintiff's property . . . was excessive, unequal or tended to discriminate against plaintiff or cause plaintiff to bear an excessive or unequal burden of taxation," or "tending to prove or establish any fraud, mistake, arbitrary, willful or capricious action on the part of said assessor." In appellant's closing brief it is said: "It may be conceded under the authorities that the county board of equalization is a *quasi*-judicial tribunal, and that its decisions may be at-

tacked only upon the ground of fraud or what is termed, 'something equivalent to fraud.'" In *Los Angeles etc. Co.* v. *County of Los Angeles,* 162 Cal. 164 [9 A. L. R. 1277, 121 Pac. 384], it was held that, after the board of equalization has upheld an assessment in a case such as this, any fraud on the part of the assessor becomes immaterial and that the determination of the board "cannot be avoided unless the board has proceeded 'arbitrarily and in willful disregard of the law intended for their guidance and control, with the evident purpose of imposing unequal burdens upon certain of the taxpayers,' . . . or unless there be something equivalent to fraud in the action of the board." The assessment is presumed to be fair and the burden of proof rested upon petitioner in the proceeding before the board. (*Sunday Lake Iron Co.* v. *Township of Wakefield,* 247 U. S. 350 [62 L. Ed. 1154, 38 Sup. Ct. Rep. 495].) In the absence of evidence tending to show the value of plaintiff's lands or of other lands in the county, the premises were wanting from which a conclusion could be drawn by the board that inequality of assessments existed. Appellant relies on the case of *Birch* v. *County of Orange,* 186 Cal. 736 [200 Pac. 647]. In that case the plaintiffs appealed from a judgment of nonsuit. The facts proven on the trial therein had been proven at the hearing before the board of equalization. In reversing the judgment the court said: "The evidence of plaintiff presented on the hearing before the board of equalization, and on the trial, discloses that this tract is surrounded by other oil lands almost identical in character, development, production, and value, compared acre for acre of proved and producing oil lands alone, which, under the same assessment, were valued at a rate from ten to fifteen times less than was placed on plaintiff's lands." In *Southern Pac. Land Co.* v. *San Diego Co.,* 183 Cal. 543, 546 [191 Pac. 931], in holding that the trial court erred in sustaining a general demurrer to the complaint, the court said: "The complaint substantially charges that the property of plaintiff was assessed at nearly twice its real value, while the other property in the county was assessed, in pursuance of a 'systematic, willful, and intentional' scheme to so do, at not to exceed twenty-five per cent of its real value, and that all this was shown to the board of equalization by evidence without substantial contradiction or conflict . . . and that the

board *'with full knowledge'* of these facts and 'without regard to said facts and in disregard of the evidence,' arbitrarily denied plaintiff's application for relief. . . . An entirely different situation would be presented here if the complaint did not show that the board had denied plaintiff's application with full knowledge of all the facts alleged.''

[3] Proof that one taxpayer's lands are assessed at a higher value than those of his neighbors does not justify the inference that there is any inequality in the assessments, in the absence of proof of the relative market values of the lands compared. The complaint alleges and the evidence shows that lands generally in Butte County are assessed at sixty per cent of their market values. If it be assumed that the board had knowledge of such practice, then the question before the board for their determination was twofold: (1) What was the value of plaintiff's lands and (2) were they assessed for more than sixty per cent of such value? Under the authorities cited, the determination of that question by the board is conclusive, in view of the facts disclosed by the evidence.

[4] The evidence supports the finding that plaintiff's lands were not assessed for more than their cash value. Plaintiff purchased the lands in 1914 at $35 an acre. Defendant's witnesses at the trial placed their value at from $75 to $125 an acre on March 1, 1919. Some of these witnesses placed a valuation of $65 an acre on lands adjoining those of the two gun clubs. One of the supervisors testified that the assessments of such adjoining lands were not before the board for adjustment in 1919; that the board's attention was first called to the alleged inequality in assessments July 29, 1919, when plaintiff appeared, asking that its assessment be reduced; that it was then too late to cite the owners of such surrounding lands to show cause why their assessments should not be increased, because the law required five days' notice and the board of equalization was required to complete its work by the 4th of August, but that in the following year they were so cited and their assessments were raised as set out in the first part of this opinion. [5] It cannot be presumed, in the absence of proof, that the members of the board had personal knowledge of the value of plaintiff's lands or of the surrounding lands at the time plaintiff presented its case before the board.

[6] If the inequality complained of be conceded, and even if it be assumed, contrary to the fact, that the plaintiff offered to prove such inequality before the board, there is high authority to sustain the conclusion that the failure of the board to raise the assessment on surrounding lands in 1919, under the circumstances stated, did not constitute fraud or "something equivalent to fraud." In *Sunday Lake Iron Co.* v. *Township of Wakefield, supra,* it appeared that the state board of tax assessors had raised the assessment of plaintiff's property from $65,000 to $1,071,000, the alleged full value thereof, whereas other lands throughout the county were generally assessed at not exceeding one-third of their value. The court said: "Because of alleged lack of time and inadequate information, it [the board] declined to order a new and general survey of values or generally to increase other assessments, notwithstanding plaintiff in error represented and offered to present evidence showing that they amounted to no more than one-third of the true market values. . . . The record discloses facts which render it more than probable that plaintiff in error's mines were assessed for the year 1911 (but not before or afterwards) relatively higher than other lands within the county, although the statute enjoins the same rule for all. But we are unable to conclude that the evidence suffices clearly to establish that the state board entertained or is chargeable with any purpose or design to discriminate. Its action is not incompatible with an honest effort in new and difficult circumstances to adopt valuations not relatively unjust or unequal. When plaintiff in error first challenged the values placed upon the property of others no adequate time remained for detailed consideration, nor was there sufficient evidence before the board to justify immediate and general revaluations. The very next year a diligent, and so far as appears, successful effort was made to rectify any inequality."

Under the foregoing facts as found by the court the plaintiff was not entitled to recover any part of the taxes paid. The other alleged errors have no bearing upon such findings and a discussion thereof would serve no useful purpose, since the facts found upon uncontradicted evidence preclude a recovery.

The judgment is affirmed.

Hart, J., and Burnett, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on January 29, 1923, and the following opinion then rendered thereon:

FINCH, P. J.—In its petition for rehearing appellant complains that the opinion filed does not accurately state its contention and that "plaintiff never did advance, and does not now advance, the contention" that "its lands should have been classed as grazing lands in making the assessment, without consideration of their market value as a hunting preserve." In its petition to the board of equalization appellant alleged "that the only value agriculturally said land has is for grazing," and made no reference to any other value. Mr. Adams, the secretary and treasurer of the appellant, who verified the petition and personally appeared before the board, testified at the trial that the application before the board was based on the assumption that the land should have been classed as grazing land. Mr. Hinsdale, who was a director of the club and appeared before the board as attorney for petitioner, testified at the trial: "I made the point there that I doubted very much that the mere fact that a man might satisfy a whim or follow a hobby would establish a value on his land, citing an instance of a man who might enjoy wild life and might pay any price or refuse any price to build a home or watch birds flying around." Mr. Moore, a member of the club, testified that the market value of plaintiff's land was about $15 an acre and stated that he based his answer on the revenue which the land would produce for grazing purposes. In its opening brief appellant made the contention that the land "is practically worthless for anything except pasture land" and said: "In reality the tax which was levied was not a direct tax at all but an excise tax or license on the privilege of hunting. . . . It would be as reasonable to say that a strip of water on the bay of San Francisco, where there may be fish, would have a market value as land, as to say that worthless land has a value of $50 an acre because ducks are abundant on it." In view of all the foregoing, counsel's assertion that plaintiff never did make the contention attributed to it is a matter of surprise. Appellant's position here would have been stronger if it had directed its efforts before the board of equalization to a comparison of the mar-

ket value of its lands with the market values of adjoining lands, rather than to a comparison based on grazing and agricultural qualities.

The question to be determined is whether the decision of the board of equalization was based on fraud or the equivalent of fraud. The conduct of the board must be determined from the evidence produced before it. The hearing was informal and the evidence was not reduced to writing. Mr. Adams testified at the trial that the assessor's plat-book of 1919 was produced before the board; that Mr. Hinsdale pointed out the "ten dollar assessments around these fifty dollar assessments," stated that plaintiff's and the surrounding lands were of like character, and that they were of like value. Mr. Hinsdale testified that he appeared before the board and "made a statement of our grievances, referred to the plat and . . . pointed out the adjoining holdings and how they were assessed and called attention to the fact that the adjoining lands were much the same as a large portion of ours except they were higher. We were the lowest point and the lands east and north were higher lands and used, most of them, for the same purpose—pasture and hunting—and that the only line between them was the wire fence . . . and explained that I thought an assessment of fifty dollars on our lands and ten on the adjoining, a raise of five to fifty on ours and to ten on theirs was unfair and not according to the provision of the Constitution. . . . Mr. Porter and Mr. Whipple . . . and Mr. Evans and I think one other gentleman asked me various questions and I was on my feet for . . . maybe half an hour answering their questions about the character of the land and about its value for duck hunting and what memberships were worth and various questions. . . . Mr. Evans asked me if I thought it was not fair that this club should not help to pay with the taxes of the men who ate the ducks. Mr. Porter asked if we didn't have all the ducks over there and volunteered that when the shots were fired that the ducks went into his ground. . . . The only evidence that was produced was the evidence that I produced, except two or three questions that Mr. Adams answered at my request." On cross-examination the witness testified: "Didn't you say . . . that the selling value of the land was not material because you didn't want to sell it? A. I may have said it so far as I was per-

sonally concerned. I couldn't speak for all the club.'' Mr. Porter, a member of the board of equalization, testified: ''No one was sworn and gave evidence. . . . Mr. Hinsdale was the principal spokesman and his was a mere matter of argument as an attorney. We asked him what he considered the value of the land per acre. The answer he made was there was no price upon the land as they did not wish to sell it. . . . In 1919 a great portion of Butte lands were doubled in assessment and some of them trebled. . . . The board of supervisors never had looked at what this property [adjoining lands] was assessed at. When the Wild Goose Country Club people came before the board and entered the complaint it was getting late in the month. The assessor had asked the state board of equalization for an extension of time. They gave him an extension of time, if I remember, to the 19th of July, also that the board of supervisors must finish their work the 4th of August. The Wild Goose, the Country Club, came before the board . . . on the 29th. . . . In order to cite those people to appear . . . the board of supervisors had to give them a special notice describing their land and five days notice and we had to finish our work in five days. . . . It was absolutely impossible in 1919 to cite those people to appear before the board and show why their assessment should not be raised.'' The evidence sustains the finding that all the property in the county, including that of plaintiff, was fairly assessed, except these adjoining lands. When the low assessments of adjoining lands were called to the attention of the board it was too late to raise the assessment on such lands for that year. The members of the board had a choice of three courses: (1) To reduce plaintiff's assessment to that of the adjoining lands, thus relieving plaintiff of a large part of its just share of taxes, at the expense of all other taxpayers whose lands were assessed at the same relative value as plaintiff's; (2) to make a horizontal reduction in the assessment of all property except that which was undervalued; (3) To let the assessment stand, as they did, and correct the inequality the following year. The burden of proof was on the plaintiff to show fraud or its equivalent and it cannot be said, under the evidence, that the action of the board, in adopting the third rather than either of the other courses open to it, constituted fraud or the equivalent of fraud.

Appellant attempts to distinguish between this case and that of *Sunday Lake Iron Co.* v. *Township of Wakefield,* cited in the opinion filed. Each case involved the question of fraud or its equivalent on the part of a board of equalization and, however much the cases may differ in other respects, the attempt to distinguish between them on the question under consideration is not convincing. Neither is there any conflict between the opinion herein and that in the case of *Birch* v. *County of Orange,* 186 Cal. 736 [200 Pac. 647]. The facts proved before the board of equalization in this case are so meager as compared with those shown in the Birch case, as pointed out in the opinion, that there is little in common between the two cases. There is no doubt as to the correctness of appellant's contention that lands "of the same quality and similarly situated" should be assessed at the same value. The quality and situation of the property, however, must be understood to include all the elements which combine to establish its market value. Plaintiff's lands are not of the same quality as the surrounding lands. One of plaintiff's witnesses testified that more than half of its lands are covered with water during the whole year and that three-fourths thereof are covered for three-fourths of the year, while the evidence shows that the surrounding lands are higher than those of plaintiff. One of defendant's witnesses testified that the hunting on plaintiff's land is "many times better" than on the adjoining lands.

Appellant contends "that a radically different method was used in valuing appellant's property" than in the assessment of adjoining lands, in that value for hunting purposes was considered as a factor only in the assessment of appellant's and another gun club's lands. Values of from $25 to $40 an acre were placed on the adjoining lands in 1920 as grazing and farming lands. Their values for hunting purposes were not considered. It is a fair inference from the evidence that such lands were more valuable for farming and grazing than as hunting grounds and, being assessed according to their most valuable use, it is immaterial that a less valuable use was not considered. The low assessment of these lands in 1919 was not due to any failure to consider their values for hunting purposes but failure to give proper consideration to their higher values as farming and grazing lands.

Plaintiff alleged that all the lands in Butte County, with the exception of its own and those of another gun club, were assessed at sixty per cent of their cash values and that plaintiff's land was assessed at five times its cash value. There was ample evidence to show that all lands in the county, including plaintiff's, were assessed at sixty per cent of their cash values, excepting certain adjoining or neighboring lands which were undervalued. Plaintiff then must recover, if at all, not on the express allegations of its complaint that its lands were assessed for more than their value, nor upon the theory that its lands were assessed relatively higher than other lands generally, but on the proof that certain other lands were assessed at less than sixty per cent of their cash value. In other words, plaintiff's cause of complaint, as disclosed by the evidence, is not that its own lands are assessed too high but that certain other lands are assessed too low. Plaintiff has no greater cause of complaint on account of these low assessments than has every other taxpayer in the county whose lands were fairly assessed. The law certainly does not contemplate that a taxpayer, whose lands are assessed at the same relative value as other lands generally in the county, is entitled to have his assessment reduced to the level of a comparatively small number of parcels which are assessed at a low figure. If such were the law but few assessments could be upheld, because absolute equality in the assessment of thousands of parcels of land is impossible of accomplishment. "Unless it is shown that the undervaluation was intentional and systematic, unequal assessment will not be held to violate the equality clause." (*Southern Ry. Co. v. Watts* (U. S.) 67 L. Ed. 199, 43 Sup. Ct. Rep. 195.)

Plaintiff sought to recover the difference betwen the sum it actually paid as taxes and the amount it would have been required to pay under a relatively uniform assessment. It will be interesting to ascertain what that difference actually is as shown by the evidence. The total assessment of all property in Butte County for the year 1919 was something over $42,500,000. The evidence shows that the lands claimed to have been undervalued in 1919 were raised to a fair valuation in 1920, the aggregate increase being between $75,000 and $100,000. If it be assumed that such lands were of the same value in 1919 as in 1920, then in the former year they were undervalued to the extent of not more than $100,-

000. If these lands had been fairly valued, the total assessment of the county for the year 1919 would have been $42,-600,000. Plaintiff alleges that the tax rate was $2.55. The problem then is to determine what rate of taxation would have been required on a valuation of $42,600,000 to raise the same amount as was produced on an assessment of $42,-500,000 at the rate of $2.55. A simple calculation shows that it would have required a rate of $2.544 and, since plaintiff's total assessment was $87,485, its taxes would have been reduced to the extent of $5.25.

The petition for a rehearing is denied.

Burnett, J., and Hart, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 26, 1923.