[Civ. 18444. Fourth Dist., Div. One. Oct. 17, 1979.]

COUNTY OF ORANGE, Plaintiff and Appellant, v.
KENNETH CORY, as State Controller, Defendant and Appellant.

---

COUNSEL

Adrian Kuyper, County Counsel, John W. Anderson and Edward N. Duran, Deputy County Counsel, for Plaintiff and Appellant.

Evelle J. Younger and George Deukmejian, Attorneys General, L. Stephen Porter, Assistant Attorney General, and Henry G. Ullerich, Deputy Attorney General, for Defendant and Appellant.

---

OPINION

FOCHT, J.*—This appeal concerns conflicting claims of the County of Orange (County) and the State of California to certain funds. The funds were derived from payment to the County of cancellation fees by the owners of an agricultural preserve upon cancellation of an agreement executed between the County and the property owners pursuant to the California Land Conservation Act of 1965. This act, generally known as the Williamson Act since the 1967 amendments, was a legislative effort to maximize the preservation of agricultural land and discourage the premature conversion of such land to urban use. As noted in *Kelsey* v. *Colwell,* 30 Cal.App.3d 590, 592 [106 Cal.Rptr. 420]: "The California Land Conservation Act of 1965, also known as the Williamson Act, is set forth in chapter 7, title 5, commencing with section 51200 of the Government Code. Briefly, the act is implemented by a city or county through the establishment of agricultural preserves consisting of agricultural and other vacant lands, and the execution of long term contracts with land owners who are willing to restrict the land uses of their property to agricultural and similar endeavors; thereafter, the lands must be assessed for city or county tax purposes according to the restricted land use, not necessarily the highest and best use. [Citations.]"

*Assigned by the Chairperson of the Judicial Council.

In 1965 and 1966, the Revenue and Taxation Code was amended to implement the tax benefits to inure to the property owners as consideration for placing their land in the agricultural preserves contemplated by the act.

In 1966, the Constitution was amended to add article XXVIII (now, in substance, art. XIII, § 8), which provided in part: "Notwithstanding any other provision of this constitution, the Legislature may by law define open space lands and provide that when such lands are subject to enforceable restriction, as specified by the Legislature, to the use thereof solely for recreation, for the enjoyment of scenic beauty, for the use of natural resources, or for production of food or fiber, such lands shall be valued for assessment purposes on such basis as the Legislature shall determine to be consistent with such restriction and use. All assessors shall assess such open space lands on the basis only of such restriction and use, and in the assessment thereof shall consider no factors other than those specified by the Legislature under the authorization of this section."

In 1967, section 422 was added to the Revenue and Taxation Code (Stats. 1967, ch. 1711, p. 4273) defining "enforceable restriction" as follows: "Enforceable restriction to open-space land is specified as a contract or agreement authorized by the Land Conservation Act or a scenic easement deed where the agreement or deed, taken as a whole, provides restrictions, terms, and conditions which are substantially similar or more restrictive than those required by statute for a contract. Under no circumstances shall a contract or agreement be an enforceable restriction for purposes of this article after notice of nonrenewal has been given by the property owner or where less than six years remain to the expiration of a contract or agreement after notice of nonrenewal has been given by a city or county and the property owner protests the nonrenewal. Under no circumstances shall a deed be an enforceable restriction for purposes of this article where less than six years remain to the expiration date of the deed."

Article 5 of the Williamson Act (Gov. Code, §§ 51280-51286) provides for cancellation of contracts between property owners and local agencies and requires payment by the property owners of cancellation fees based upon a percentage of the reassessed valuation of the property. Pertinent amendments to article 5 since its original enactment will be discussed *infra.*

The case at bench concerns the sum of $324,690 paid into the treasury of the County upon cancellation of an agreement entered into between the County and the owners of property known as the Nohl Ranch property pursuant to the Williamson Act. Based upon the state's claim to the sum, it was deducted from the 1977 payment to the County of its share of the motor vehicle license fee account, pursuant to the state's right of offset. (Gov. Code, § 12419.5.) Thereafter, the County petitioned for a writ of mandate directing the State Controller to pay to it the sum in dispute. The trial court granted the writ and the Controller appealed. The County has filed a cross-appeal seeking reversal of that portion of the judgment denying it interest and attorney's fees. However, it has withdrawn its appeal with reference to the denial of attorney's fees.

The agreement relating to the Nohl property was executed February 26, 1969. It was executed pursuant to the Williamson Act for a period of 10 years with provision for automatic renewal on each succeeding January 1st, unless a notice of nonrenewal was given by either party. It provided for the payment of deferred taxes in the event of cancellation pursuant to the provisions of the act.

In September and October 1971, the coowners of the property gave notice of nonrenewal, thereby fixing the termination date of the agreement as February 26, 1981. On March 6, 1974, the agreement was cancelled pursuant to resolution of the county board of supervisors.

When the agreement was executed in 1969, Government Code section 51283, as amended in 1967, provided in part: "(a) Upon the cancellation of any contract, and as soon thereafter as the land to which it relates is reassessed by the assessor, the landowner shall pay to the county treasurer, as deferred taxes, an amount equal to 50 percent of the new equalized assessed valuation of the property; provided, however, if after the date the contract was initially entered into the publicly announced county ratio of assessed to full cash value is changed, the percentage payment in this subdivision shall be changed so no greater percentage of full cash value will be paid than would have been paid had there been no change in ratio.

". . . . . . . . . . . . . . . . . . .

"(c) When the deferred taxes required by this section are collected, the county treasurer shall distribute the taxes to each taxing agency existing in the fiscal year of collection in the tax code areas in which the parcels of

the property are located. The amount of taxes on all parcels in the same tax code area shall be determined. The taxes for each tax code area shall be distributed in the same proportion that each taxing agency's tax rate in the fiscal year of collection bears to the total tax rate of the code area in the fiscal year of collection."

In 1971, the Legislature enacted a property tax relief measure which, inter alia, provided supplements to local governments for tax revenue lost through reduced assessments on prime agricultural and open-space land. (Stats. 1971, First Ex. Sess., ch. 1, §§ 2.3-3.4, pp. 4881-4884.) In the same session, the Legislature amended Government Code section 51283, adding thereto: "(d) When deferred taxes required by this section are collected, they shall be transmitted by the county treasurer to the State Controller to be deposited in the State General Fund."

The state contends it is entitled to the cancellation fees derived from the cancellation of the Nohl Ranch agreement by virtue of the provisions of section 51283, subdivision (d). The County contends the section is inapplicable to the agreement.

Central to the controversy is the fact the Williamson Act when first enacted, and until amendments thereto passed in 1969 and not effective until subsequent to the execution of the Nohl agreement, recognized two types of arrangements between property owners and cities or counties, "contracts" and "agreements." The County contends Government Code section 51283, including subdivision (d), is applicable solely to contracts and not to agreements.

The Williamson Act authorized local entities to contract with owners of prime agricultural land to preclude any uses other than agricultural or compatible use for 10 years. A requirement of the contract was that as each year passed, another year would automatically be added to the contract time, unless a notice of nonrenewal was given. Provision was made for an annual payment to the landowners of five cents for each dollar of assessed value.

A second arrangement authorized by the act was an "agreement." Agreements were not necessarily for 10 years, nor were they required to have an automatic renewal provision. The agricultural land included in a preserve covered by an agreement did not have to qualify as "prime." Landowners under agreements could receive no payment of public funds. In 1969, the Williamson Act was amended and the former distinction

between "contracts" and "agreements" was eliminated. (Stats. 1969, ch. 1372, repealing Gov. Code, §§ 51255-51256, and amending Gov. Code, § 51240 et seq.)

Section 44 of chapter 1372 provided as follows: "The provisions of this act shall be given prospective application only and shall not be construed in a manner which would impair the obligation of any existing contract or agreement entered into pursuant to the California Land Conservation Act of 1965, prior to the effective date of this act. However, this section is not intended to prevent the provisions of this act from being incorporated by reference into existing contracts or agreements, if such existing contracts or agreements provide for incorporation by reference of amendments subsequently enacted by the Legislature; provided further, however, that this act shall not, by incorporation by reference or otherwise, invalidate any restrictions, terms, or conditions, including payments and fees, more restrictive than or in addition to those required by this chapter."

Revenue and Taxation Code section 421, as amended in 1969, has continued to recognize and define both "contracts" and "agreements" as follows: "(b) 'Contract' means a contract executed pursuant to the California Land Conservation Act.

"(c) 'Agreement' means an agreement executed pursuant to the California Land Conservation Act prior to the 61st day following the final adjournment of the 1969 Regular Session of the Legislature and which, taken as a whole, provides restrictions, terms, and conditions which are substantially similar or more restrictive than those required by statute for a contract."

The County's position is that Government Code section 51283, at the time of the cancellation of the Nohl agreement (as well as at all times since its original enactment), referred only to contracts. Therefore, asserts the County, in directing the deposit with the state of deferred taxes, the section has no application to such funds when collected upon cancellation of an agreement. It contends paragraph 10 of the agreement governs and payment to the County is required.

The County conceded in its replication to the Controller's answer and in oral argument at the hearing in the trial court that the Legislature has the power to mandate that deferred taxes collected upon cancellation of agreements go to the state, regardless of the terms of the agreement. There is no constitutional impediment to such legislation. (*County of*

*Alameda* v. *Janssen*, 16 Cal.2d 276, 284 [106 P.2d 11, 130 A.L.R. 1141]; *County of Tulare* v. *City of Dinuba*, 188 Cal. 664, 669 [263 P. 249].) But, urges the County, the Legislature in enacting subdivision (d) of section 51283 did not intend to alter the disposition of cancellation fees paid pursuant to agreements, as the subdivision was added to a statute that dealt solely with contracts.

We consider of significance the fact that Assembly Bill No. 2117, as originally introduced to enact the California Land Conservation Act, provided only for "contracts." As the bill progressed toward passage, article 3.5 (Gov. Code, §§ 51255-51256) was added to provide for "agreements," less restrictive arrangements to preserve agricultural land which did not qualify as "prime." However, article 5, the article covering cancellation, remained as originally drafted and, when enacted, continued to use the term "contract." Unless article 5 was intended to refer also to agreements, the act, when passed, made no provision for cancellation of agreements.

Various reports are cited in the briefing and in the record on appeal. It is indicated there was widespread execution of documents designated as "agreements" which purported to contain "enforceable restrictions" so as to qualify for special tax consideration under the Constitution and Revenue and Taxation Code.

The Controller contends the Legislature, in providing no means for cancellation other than pursuant to article 5 of the act, must have intended its provisions were to apply to agreements after article 3.5 was inserted during the legislative process, even though article 5 was not amended to specifically refer to agreements. This legislative intent is additionally demonstrated, urges appellant, by the amendments passed in 1969. This legislation banned new agreements and required existing agreements to provide restrictions, terms and conditions substantially similar or more restrictive than those required for contracts. (Stats. 1969, ch. 862, § 2, p. 1702.) The 1969 legislation also provided for amendments to existing agreements to conform to these requirements. (Stats. 1969, ch. 1372, § 27, p. 2813.) In effect, says appellant, while preexisting agreements could be continued, the 1969 Legislature substantially eliminated any distinction between "contracts" and "agreements."

It is also contended by appellant that such legislative intent is consistent with the statutory scheme enacted in 1971 whereby, as part of a total tax revision program, replacement or subvention payments were to be provided cities and counties which incurred reduction in property tax

revenues due to establishment of open-space preserves, whether by contract or agreement. It would be inconsistent with that statutory scheme, says appellant, to provide for subvention funds to be paid for both contracts and agreements but on cancellation the local agency would keep the cancellation fees from agreements but not contracts.

We conclude the Legislature, at least by the time of the enactment of Government Code section 51283 in its present form (Stats. 1971, First Ex. Sess., ch. 2, § 13, p. 5139), with its knowledge of the existence of many continuing agreements subject to payment of deferred taxes upon cancellation, intended that the disposition of such deferred taxes be covered by that section. Section 1549 of the Civil Code defines a contract as an agreement. For the term "contract" as used in the section to mean anything other than a generic application of the term would lead to a purposeless, illogical and random flow of funds, in some instances to counties and cities and in other instances to the state. Such an anomaly would be inconsistent with sound principles of statutory construction. "It is a fundamental rule of statutory construction that statutes should be construed to avoid anomalies." (*State of South Dakota* v. *Brown,* 20 Cal.3d 765, 775 [144 Cal.Rptr. 758, 576 P.2d 473].) "If possible, a statute should be interpreted to produce a reasonable result; the consequences of any particular interpretation must be considered." (*Anderson Union High Sch. Dist.* v. *Schreder,* 56 Cal.App.3d 453, 460 [128 Cal.Rptr. 529].)

Quotations from the preliminary report in 1969 of the Joint Committee on Open Space Land of the Legislature are contained in the County's opening brief, and testimony before the Assembly Committee on Planning and Land Use in 1971 is contained in the record on appeal. From this material, it appears there had been no consistent pattern throughout the state regarding the use of agreements and contracts. In fact, it appears a considerable number of counties offered only agreements. It impresses us as improbable the Legislature would have intended deferred taxes incident to cancellation of all agreements to continue to go to the counties. In the absence of such intention, it must be inferred the Legislature assumed and intended the word "contract" in the cancellation provisions of article 5 was used in the generic sense and included agreements.

We have considered the contention of the County that the wide disparity between subvention payments available for prime agricultural land and nonprime land is a reasonable basis for cancellation fees regarding prime land under contract going to the state, and those

pertaining to nonprime land going to the counties. We do not find the argument persuasive. Agreements could continue to run for many years during which subventions would be paid. That fees payable upon ultimate cancellation would also go to the counties impresses us as inconsistent with the overall purpose and scope of the 1971 legislation. The fact in the instant case that at the time the County voted to terminate the agreement the subvention due from the state was minimal or nonexistent, does not bear upon the issue as to whether the state intended the statute to apply to all cancellations after its effective date.

A perceptive summary of the rules pertinent to statutory interpretation is stated in the opinion in the case of *Steilberg* v. *Lackner,* 69 Cal.App.3d 780, 785 [138 Cal.Rptr. 378]: "Paramount among these rules are the following: In construing a statute, the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law [citations]. In determining the legislative intent, the court turns first to the words used in the statute [citation]. The words, however, must be read in context, keeping in mind the nature and obvious purpose of the statute [citation], and the statutory language applied must be given such interpretation as will promote rather than defeat the objective and policy of the law [citation]. Statutes or statutory sections relating to the same subject must be construed together and harmonized if possible [citations]. Finally, in ascertaining legislative intent, the court should consider not only the words used, but should also take into account other matters, such as the object in view, the evils to be remedied, the history of the times, legislation upon the same subject, public policy and contemporaneous construction [citations]."

The briefs on appeal offer contentions regarding the probable intent of the parties at the time of execution of the Nohl agreement. Our decision is based upon our interpretation of legislative intent and is not dependent on the intent of the parties. However, contemporaneous construction is one of the guides to statutory construction. (*Henry* v. *City of Los Angeles,* 201 Cal.App.2d 299, 319 [20 Cal.Rptr. 440]; *Equitable Life etc. Soc.* v. *Johnson,* 53 Cal.App.2d 49, 56 [127 P.2d 95]; Civ. Code, § 3535.) It may be noted the document provided for cancellation in accordance with the then existing provisions of article 5 of the Williamson Act, which suggests the parties considered the provisions of that article applicable to the agreement. Paragraph 10 of the agreement provided the cancellation shall be in accordance with sections 51284 and 51285 of the Government Code which contained reference only to contracts. Paragraph 12 of the agreement provided the deferred taxes payable upon cancellation shall be distributed in accordance with Government Code section 51283, subdivi-

sion (c), which at the time the agreement was executed made provision for the manner in which the taxes would be allocated by the treasurer of each county. This implies no more than that the cancellation procedure was to be in accordance with the provisions of article 5 of the act.

It is apparent the Nohl agreement was drafted with recognition of the fact that unless it was in accord with the authorizing constitutional and statutory provisions, it would not qualify as an enforceable restriction so as to achieve the desired tax saving. It utilized the cancellation valuation procedure of article 5 of the Williamson Act, the only such procedure the Legislature had provided.

Also of significance from the standpoint of the intention of the parties, is the fact paragraph 4 of the Nohl agreement provided notice of nonrenewal would be given "as provided by Section 51245 of the California Government Code." That section, while not part of article 5 covering cancellation, also refers only to contracts. The resolution of the board of supervisors of the County, dated October 26, 1971, by which receipt of the notice of nonrenewal was acknowledged and ordered filed, recited the notice was given pursuant to section 51245 of the California Government Code. It can be implied from these references the total absence in the Williamson Act of any reference to nonrenewal and cancellation of "agreements," as such, led the parties to conclude the provisions covering these subjects, while using the term "contracts," were equally applicable to agreements.

The fee in question, $324,690, was calculated pursuant to Government Code section 51283. Upon cancellation of the Nohl agreement, there was no impairment of the obligation of the contract of the property owners. The only issue is which government agency is entitled to the funds. The entitlement is determined by statute, not agreement. We hold the Legislature did not intend to except agreements entered into prior to 1971 from the application of Government Code section 51283, subdivision (d), and the trial court should have denied the petition for the writ of mandate.

Judgment reversed.

Brown (Gerald), P. J., and Cologne, J., concurred.

A petition for a rehearing was denied November 6, 1979, and the petition of the plaintiff and appellant for a hearing by the Supreme Court was denied December 20, 1979.