[Civ. No. 47559. First Dist., Div. Two. Sept. 23, 1980]

STEPHEN N. DORCICH, as Executor, etc., Plaintiff and Respondent, v.
HUEY D. JOHNSON, as Secretary, etc., et al., Defendants and Appellants.

488

COUNSEL

George Deukmejian, Attorney General, N. Gregory Taylor, Assistant Attorney General, Neal J. Gobar and Richard C. Jacobs, Deputy Attorneys General, for Defendants and Appellants.

Yaroslav Sochynsky, Karin A. Kramer, Thomas D. Trapp and Landels, Ripley & Diamond for Plaintiff and Respondent.

OPINION

**TAYLOR, P. J.**—The Secretary of the Resources Agency (Secretary) appeals from a judgment granting to the landowner, Dorcich,[1] a writ of mandate to compel the Secretary's approval of a waiver of the major portion of a Williamson Act[2] (Gov. Code, § 51200 et seq.) cancellation fee, as recommended by the local agency, the City of Santa Clara (City). We have concluded that the judgment must be reversed and the matter remanded to the Secretary for the exercise of his discretion pursuant to Government Code section 51283, subdivision (c)(3).

The facts are not in dispute. In 1968, Dorcich entered into two land conservation agreements with the County of Santa Clara (County) under the Williamson Act, which grants preferential property tax consideration to landowners who agree to keep their land in agricultural or a compatible nonurban use for a minimum period of time. Article 5 of

---

[1]Pursuant to stipulation, respondent Stephen N. Dorcich was substituted for the three original plaintiffs, his predecessors in interest.

[2]The California Land Conservation Act of 1965 has been known as the Williamson Act since the 1967 amendments.

the Williamson Act (Gov. Code, §§ 51280-51286) provides for cancellation of these agreements and requires payment by the property owner of a cancellation fee equal to 50 percent of the new assessed valuation of the property.

In 1969, Dorcich indicated that he did not wish to renew the agreements. The County agreed and in 1974, its successor, the City, after a hearing, decided to reduce the cancellation fee from $90,600 to $11,544.92. The applicable statute, Government Code section 51283, as amended in 1971, set forth below,[3] requires the Secretary's approval of the waiver. The Secretary refused to approve the Dorcich waiver and this action ensued.

---

[3]"(a) Prior to any action by the board or council giving tentative approval to the cancellation of any contract, the county assessor of the county in which the land is located shall determine the full cash value of the land as though it were free of the contractual restriction. The assessor shall multiply such value by the most recent county ratio announced pursuant to Section 401 of the Revenue and Taxation Code, and shall certify the product to the board or council as the cancellation valuation of the land for the purpose of determining the cancellation fee.

"(b) Prior to giving tentative approval to the cancellation of any contract the board or council shall determine and certify to the county auditor the amount of the cancellation fee which the landowner must pay the county treasurer as deferred taxes upon cancellation. That fee shall be an amount equal to 50 percent of the cancellation valuation of the property; provided, however, if after the date the contract was initially entered into the publicly announced county ratio of assessed to full cash value is changed, the percentage payment in this subdivision shall be changed so no greater percentage of full cash value will be paid than would have been paid had there been no change in ratio.

"(c) If they find that it is in the public interest to do so the board or council may waive any such payment or any portion thereof, or may make such payment or a portion thereof contingent upon the future use made of the land and its economic return to the landowner for a period of time not to exceed the unexpired period of the contract, had it not been canceled, provided:

"(1) The cancellation is caused by an involuntary transfer or change in the use which may be made of the land and the land is not immediately suitable, nor will be immediately used, for a purpose which produces a greater economic return to the owner;

"(2) The board or council has determined it is in the best interests of the program to conserve agricultural land use that such payment be either deferred or not required; and

"(3) *The waiver is approved by the Secretary of the Resources Agency.*

"(d) When deferred taxes required by this section are collected, they shall be transmitted by the county treasurer to the State Controller and be deposited in the State General Fund." (Italics added.) (Added Stats. 1969, ch. 1372, § 35; Amended Stats. 1971, First Ex. Sess., ch. 1, § 5.3, eff. Dec. 8, 1971, ch. 2, § 13, eff. Dec. 30, 1971.)

*The 1971 amendment* (*ch. 1*): 1) Deleted "and" at the end of subdivision (c)(1); 2) added; "and" at the end of subdivision (c)(2); 3) *added subdivision* (*c*)(*3*); and 4) substituted subdivision (d) for former subdivision (d).

The trial court concluded as a matter of law that: "The authority of the Secretary under Government Code § 51283(c)(3) is limited to ascertaining whether the local agency conducted a public hearing in accordance with Government Code § 51284, whether the local agency considered appropriate evidence on the question of the propriety of a fee waiver, and whether the local agency made the factual findings specified by Government Code § 51283.

"If the administrative record shows that a proper hearing was conducted, that appropriate evidence was considered by the local agency, and that the required factual findings were made, the Secretary has a mandatory duty to approve the fee waiver recommended by the local agency.

"In this case, the Secretary's refusal to approve the partial fee waiver recommended by the City Council constitutes a violation of his mandatory duty under Government Code § 51283(c)(3) because the administrative record conclusively establishes that the City Council conducted a proper hearing, considered appropriate evidence, and made the factual findings required by Government Code § 51283."

■ The question before us turns on the interpretation of the term "approved," as used in Government Code section 51283, subdivision (c)(3), quoted above at footnote 3. ■ The applicable authority is *Cosner* v. *Colusa County* (1881) 58 Cal. 274, at page 277: "The word 'approve' is to be considered in connection with the action to which it relates. It does not *ex vi termini* necessarily import the exercise of discretion. Presumptively, however, when the 'approval' of a distinct officer is made necessary to validate or consummate the act of another, it is the intention of the Legislature that he should be invested with the option to sanction officially or to disapprove the act submitted to him. It involves the idea of discretion and adjudication. Yet such presumed intention is not conclusive, and if it clearly appears from the nature of the act, or the express language of the context, that the word 'approved' is used in a more limited sense, and imposes a mere ministerial or clerical duty, the Courts will so hold."

■ The Secretary argues that "approved" must be interpreted in its usual sense of involving discretion; Dorcich, in the more limited ministerial sense, as the trial court concluded. Accordingly, we must embark on a brief history of the Williamson Act and the pertinent amendments

to its cancellation provisions since their original enactment (Gov. Code, §§ 51280-51286).

First, a brief history of the Williamson Act.[4]

Before 1966, our state Constitution required that property tax assessments be made according to the market value of the property assessed (Cal. Const., former art. XIII, § 1; *De Luz Homes Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546 [290 P.2d 544]). Thus, the assessor was compelled to consider the highest and best use to which the property was naturally adapted, and could not limit his consideration only to the use to which the land was presently put (*Wild Goose C. Club* v. *County of Butte* (1922) 60 Cal.App. 339 [212 P. 711]).

One effect of this practice was to impute to land for assessment purposes its potential development values. This effect was particularly pronounced in agricultural areas immediately adjoining urban areas, since such land was often the most logical candidate for urban expansion (Assem. Select Com. on Open Lands, Special Hearing on Suggested Remedial Approaches to the Cal. Land Conservation Act of 1965 (Mar. 23, 1973) p. 4). As property assessments and taxes increased, many agricultural landowners were forced to discontinue farming and sell or convert their land to urban development (Assem. Joint Com. on Open Space Land, Preliminary Report (Mar. 1969) at p. 10 (1969 Report)).

In 1957, the Legislature took the first step to remedy this effect and to protect significant agricultural lands from urban expansion by enacting former Revenue and Taxation Code section 402.5, which provided that where land was zoned for agricultural purposes and there was no reasonable probability of removal or modification of that zoning restriction in the near future, the assessor could consider only factors relative to the restricted use in assessing the property for property tax purposes (Stats. 1957, ch. 2049, § 1). The result was still a market value assessment, but the assessor could not consider uses which might be only theoretically possible under less restrictive zoning. In practice, however, assessors considered zoning restrictions to be easily altered and, therefore, section 402.5 had little effect (1969 Report, at pp. 27-28). In 1965, former Revenue and Taxation Code section 402.5 was amended to include a rebuttable presumption that there was no

---

[4]Our summary is based on the Secretary's brief, and is not controverted by Dorcich.

reasonable probability of removal or modification of an agricultural zoning restriction in the near future (Stats. 1965, ch. 2012, § 1). However, assessors were still free to ignore zoning restrictions if the facts so warranted (i.e., if zoning could be easily altered).

In 1965, as a further attempt to encourage the preservation of agricultural land and discourage unnecessary and premature conversion to urban uses, the Legislature enacted the Williamson Act (Gov. Code, § 51220). The act, as originally adopted, provided for: 1) contracts between cities or counties and landowners of *prime* agricultural land within agricultural preserves; or 2) agreements between cities or counties and landowners of *any* land within an agricultural preserve, to limit the use of the subject land to agricultural or compatible uses (former Gov. Code, §§ 51241, 51243, 51255; Stats. 1965, ch. 1443, § 1). The original act also provided for a limited amount of compensation by the state to the cities, counties and landowners who participated in the land conservation program to induce participation and offset the costs of administering the program (former Gov. Code, §§ 51260-51263; Stats. 1965, ch. 1443, §1).

The primary inducement for landowner participation, however, was former Revenue and Taxation Code section 402.6, which provided that the assessor in his assessment of land under such contract or agreement, was limited only to consideration of the restricted use when there was no reasonable probability of removal of the restriction in the near future (Stats. 1965, ch. 2012, § 2). However, since the Constitution still mandated the standard of valuation as market value, there was some concern about the validity of the legislation.[5]

To answer that concern, at the general election of November 6, 1966, the people amended the state Constitution, so far as pertinent, to declare: "...[I]t is in the best interest of the state to maintain, preserve, and otherwise continue in existence open space lands for the production of food and fiber and to assure the use and enjoyment of natural resources and scenic beauty for the economic and social well-being of the state and its citizens.... [A]ssessment practices must be so designed as to permit the continued availability of open space lands for these purposes...." (Former art. XXVIII, § 1.)[6]

---

[5]The provisions of former Revenue and Taxation Code sections 402.5 and 402.6 are now codified, with amendments, in Revenue and Taxation Code section 402.1.

[6]This policy is now, in substance, set forth in article XIII, section 8.

After the constitutional amendment, the Legislature enacted Revenue and Taxation Code sections 421-425 (Stats. 1967, ch. 1711), defining open space land, inter alia, as any land within a Williamson Act agricultural preserve, and enforceable restrictions as, inter alia, contracts and agreements under the Williamson Act. The Legislature instructed assessors to consider only factors relative to the restricted use and not sales data on unrestricted parcels.

In 1969, partially to reflect the above mentioned changes in the Revenue and Taxation Code and the California Constitution, the Legislature also substantially amended the Williamson Act (Stats. 1969, ch. 1372). Contracts thereafter could be entered into limiting the use of *any* agricultural land, not only prime agricultural land (Gov. Code, § 51240; Stats. 1969, ch. 1372, §§ 9, 28, 29). The state compensation program was repealed along with some of the state's supervisory functions (Stats. 1969, ch. 1372, §§ 24, 30, 32, 33, 34). All contracts were deemed enforceable restrictions within the meaning of the California Constitution (Gov. Code, § 51252; Stats. 1969, ch. 1372, § 25).

In 1971, as part of a total tax revision program, the Legislature again enacted a state compensation or subvention program (Stats. 1971, First Ex. Sess., ch. 1, § 3.2 p. 4883; Gov. Code, § 16140 et seq.), and added Government Code section 51283, subdivision (c)(3) here in issue. The purpose of the subvention program is, to a limited extent, to "provide replacement revenues to local government by reason of the reduction of the property tax on open space lands assessed under Sections 423 ... [contracted lands] of the Revenue and Taxation Code" (Gov. Code, § 16141). The state Controller pays these monies to the local governments under the direction of the Secretary (Gov. Code, § 16142). Cancellation fees are transmitted by the county treasurer to the state Controller for deposit in the state general fund (Gov. Code, § 51283, subdivision (d); *County of Orange* v. *Cory* (1979) 97 Cal.App.3d 760, 767 [159 Cal.Rptr. 78]).

Dorcich's contentions may be summarized as follows: 1) the Legislature's enactment of Government Code section 51283, subdivision (c)(3) in 1971,[7] instead of indicating a return to the more detailed provisions of the original enactment, suggests that the Legislature has entrusted local agencies with primary authority for the Williamson Act; 2) as the

---

[7]The 1967 amendments (Stats. 1967, ch. 1371, § 13, pp. 3219-3220) are not pertinent here; in any event, as discussed *infra*, the 1967 version was repealed in 1969.

major impact of the Williamson Act is on the local tax base, local agencies must control its administration.

We turn, therefore, to the evolution of Government Code section 51283 into the version here in issue. As originally enacted, the statute read as set forth below.[8] This was the version of the statute in effect in 1968 when the Dorcich agreements were executed. The agreements, however, contained clauses indicating that they would be subject to future amendments. (Presumably as the result of these provisions, the parties agree that the 1971 version of the statute is the one in issue here.)

In 1969, the 1967 version of Government Code section 51283 was repealed (Stats. 1969, ch. 1372, § 35, p. 2814) and to conform to the repeal of the subvention program, a new version enacted, so far as pertinent, as set forth below.[9]

---

[8]Section 51283. "(a)Upon the cancellation of any contract, and as soon thereafter as the land to which it relates is reassessed by the assessor, the landowner shall pay to the city or county an amount equal to 50 percent of the new assessed valuation of the property.

"(b) *If the State Board of Agriculture recommends* that it is in the public interest to do so, and *the Director of Agriculture so finds, the director may waive* any such payment or any portion thereof, or may make such payment or a portion thereof contingent upon the future use made of the land and its economic return to the landowner for a period of time not to exceed the unexpired period of the contract, had it not been canceled, provided:

"(1) The cancellation is caused by an involuntary transfer or change in the use which may be made of the land and the land is not immediately suitable, nor will be immediately used, for a purpose which produces a greater economic return to the owner; and

"(2) The city or county has recommended to the State Board of Agriculture that no such payment be required, or that the deferment of such payment or portion thereof be allowed, and the board has determined it is in the best interests of the program to conserve agricultural land use that such payment be either deferred or not required." (Italics added.) (Stats. 1965, ch. 1443, § 1, pp. 3383, 3384.)

[9]"(a) Prior to any action by the board or council giving tentative approval to the cancellation of any contract, the county assessor of the county in which the land is located shall determine the full cash value of the land as though it were free of the contractual restriction. The assessor shall multiply such value by the most recent county ratio announced pursuant to Section 401 of the Revenue and Taxation Code, and shall certify the product to the board or council as the cancellation valuation of the land for the purpose of determining the cancellation fee.

"(b) Prior to giving tentative approval to the cancellation of any contract the board or council shall determine and certify to the county auditor the amount of the cancellation fee which the landowner must pay the county treasurer as deferred taxes upon cancellation. That fee shall be an amount equal to 50 percent of the cancellation valuation of the property; provided, however, if after the date the contract was initially entered into the publicly announced county ratio of assessed to full cash value is changed, the percentage payment in this subdivision shall be changed so no greater per-

In 1971, as indicated above, with the resumption of the state subvention program, subdivision (c)(3) was added to again require the Secretary's approval of a waiver in addition to that of the local entity. (Stats. 1971, First Ex. Sess., ch. 1, § 5.3.) Thus, the legislative history indicates that state approval of a reduction or waiver of a cancellation fee was and has been required only during those periods when the statute also provided for the state's participation by its subvention program. Further, the state has a direct financial interest in the cancellation fees, which must be deposited in the state general fund.

Dorcich contends that so long as the local agency's action on a request for waiver of a cancellation fee recoups at least the amount the state has previously subvented to the local agency as the result of the particular agreements involved ($11,544.92 here), the state has no interest in the process. This argument overlooks the statewide application of the Williamson Act. The Secretary is the only source of consistent and uniform statewide cancellation fee practices. Such a factor alone indicates that the Secretary's duty is discretionary rather than ministerial (*Brown* v. *Cranston* (1963) 214 Cal.App.2d 660, 669-671 [29 Cal. Rptr. 725]; *1st Fed. etc. Assn.* v. *St. Bd. of Control* (1942) 53 Cal. App.2d 391 [128 P.2d 75]).

Dorcich's argument also ignores the function of the cancellation fee as a deterrent to the landowner to seek cancellation during the early years of the contract and to ensure that owners who execute agreements are not speculators looking for a short-term tax shelter. (See *Farmland Assessment* (1967) 55 Cal.L.Rev. 273, fn. 22, at p. 277; Mix, *Restricted Use Assessment in California: Can It Fulfill Its Objectives?* (1971) 11 Santa Clara Law. 259.) This deterrent function has been consistently

centage of full cash value will be paid than would have been paid had there been no change in ratio.

"(c) If they find that it is in the public interest to do so the board or council may waive any such payment or any portion thereof, or may make such payment or a portion thereof contingent upon the future use made of the land and its economic return to the landowner for a period of time not to exceed the unexpired period of the contract, had it not been canceled, provided:

"(1) The cancellation is caused by an involuntary transfer or change in the use which may be made of the land and the land is not immediately suitable, nor will be immediately used, for a purpose which produces a greater economic return to the owner; and

"(2) The board or council has determined it is in the best interests of the program to conserve agricultural land use that such payment be either deferred or not required." (Stats. 1969, ch. 1372, § 35, p. 2814.)

emphasized,[10] and is particularly significant here where the owner decided not to renew the agreements almost immediately after their execution.

No doubt, the Legislature recognized that it would be very difficult for the local agency to approve a cancellation, and then not waive the penalty, in the light of the potential political pressures. The Secretary is not subject to local political consequences and can ensure that the statewide purpose of conserving agricultural land is fulfilled.

Dorcich also contends that the Legislature's failure to set forth specific standards for the Secretary's approval indicates a ministerial connotation. We note that since its original enactment, the standards for cancellation or waiver have remained the same. As set forth in section 51283, they are that: 1) the waiver must be in the public interest; 2) the cancellation must be caused by an involuntary transfer or change in the use of the land; 3) the land must not be immediately suitable nor will be immediately used for a purpose which produces a greater economic return to the owner; and 4) the waiver must be in the best interests of the program to conserve agricultural land use.

To further define when a cancellation is in the public interest and consistent with the purposes of the statute, the following language has been retained in Government Code section 51282 since its original enactment, so far as here pertinent: "The existence of an opportunity for another use of the land involved shall not be a sufficient reason for the cancellation of a contract. A potential alternative use of the land may be considered only if there is no proximate, noncontracted land suitable for the use to which it is proposed the contracted land be put.

"The uneconomic character of an existing agricultural use shall likewise not be sufficient reason for cancellation of the contract. The uneconomic character of the existing use may be considered only if there is no other reasonable or comparable agricultural use to which the land may be put."

Thus, when the Legislature reinstated the requirement of state approval, it did not find it necessary to discuss the applicable standards.

[10]We note that the 1978 amendments to the Williamson Act cancellation provisions provide for additional cancellation fees (see Dean, *The California Land Conservation Act of 1965 and The Fight To Save California's Prime Agricultural Lands* (1979) 30 Hastings L.J. 1859, 1871).

■ It is "... an elementary proposition not open to doubt that in the general and customary course of any appeal from a lower hearing officer, referee, board or tribunal, *the standards* to be followed by the body of higher authority, unless otherwise authoritatively provided, *are the same* as those which control the lower: [they are determined by] the relevant law—whether enunciated by Constitution, statute, charter, ordinance, or controlling court decisions..." (*City & County of S. F.* v. *Superior Court* (1959) 53 Cal.2d 236, at p. 250 [1 Cal.Rptr. 158, 347 P.2d 294]; italics added). The standards described above clearly require the exercise of discretion and judgment (cf. *State of California* v. *Superior Court* (*Veta*) (1974) 12 Cal.3d 237, 247-248 [115 Cal.Rptr. 497, 524 P.2d 1281]).

■ We conclude, therefore, that the term "approved," as used in Government Code section 51283, subdivision (c)(3) should be given its usual statutory connotation implying discretion and judgment (*Johnston* v. *County of Yolo* (1969) 274 Cal. App.2d 46 [79 Cal.Rptr. 33]; *Brown* v. *Cranston, supra,* 214 Cal. App.2d 660; *1st Fed. etc. Assn.* v. *St. Bd. of Control, supra,* 53 Cal. App.2d 391; *McGill* v. *City & County of San Francisco* (1964) 231 Cal.App.2d 35 [41 Cal.Rptr. 568]; *Cosner* v. *Colusa County, supra,* 58 Cal. 274).

As the parties agree that a remand[11] is appropriate if the Secretary's duty is discretionary, we turn briefly to the remaining issue on appeal, namely, the scope of review.

The pertinent parts of the record indicate that in its 1973 approval of the cancellation of the Dorcich agreements, the City declared that the properties were within the boundaries of its Bayshore North Redevelopment Project, which was adopted on December 28, 1973. The City also indicated that the purpose of the project was: "... to revitalize and redevelop the project area in order to establish it to its full potential *as a major source of property tax revenues* to all governmental taxing agencies and as a major source of sales tax income, the City ... attempts *to obtain this objective by stimulating a change in land uses from uneconomic agricultural to productive, economically sound uses,* by providing access to the area, by providing adequate street and other

---

[11]The Secretary admittedly did not hold a hearing or make findings.

public facilities, and by encouraging development in the interest of the general welfare...."

The City found that the Dorcich property was "blighted"[12] and not suitable for agricultural purposes. The City then concluded that the Dorcich lands "are under lease to Marriot Corporation on a net net lease and the proceeds will not exceed the economic returns to the respective owners obtained from the lands before." Neither the lease nor several other reports[13] on which the City relied were forwarded to the Secretary.

Dorcich argues that the City's submission to the Secretary complied with California Administrative Code, title 14, section 14125, set forth below,[14] and that even a discretionary review of the record indicates that the waiver of the cancellation fee must be approved. We cannot agree.

The Administrative Code provision referred to does not pertain to the scope of the hearing to be conducted by the Secretary, but merely specifies the items to be preliminarily submitted. Further, on its face, the City's findings as to development appear directly contrary to the Williamson Act mandate to conserve agricultural land and prevent conversion to urban uses. In addition, under a net net lease, the tenant pays the property taxes and insurance (1 Augustine & Zarrow, Cal. Real Es-

---

[12]The City noted the adverse effects on crops as the property was within the landing and takeoff pattern of the San Jose Airport. The fuel or exhaust emissions from jets taking off result in a petroleum-based mist that covered the crops and reduced the yield by approximately 10 percent.

[13]Specifically, the city council minutes of March 26, 1974, refer to reports submitted by the city attorney, county assessor and city manager.

[14]Section 14125 provides: "In accordance with Sections 51061 and 51283 of the Government Code, when a governing body finds it in the public interest to waive the fee for abandoning open space easements or cancelling any Land Conservation Act contract or agreement for agricultural preserves, the governing body shall make a written request for approval of the waiver by the Secretary and provide the following information:

"(a) Date of the public hearing as required by Sections 51284 and 51061 of the Government Code.

"(b) A map showing the size and location of the parcel and the relationship of the parcel to adjoining parcels.

"(c) Present land use of the parcel.

"(d) Proposed land use of the parcel and when the change in land use will occur.

"(e) The amount of the cancellation fee. A statement of the conditions shall be submitted for partial waivers.

"(f) A narrative fully explaining the basis for cancellation and the reason or reasons for determining that a waiver of the cancellation fee is in the public interest."

tate Law and Practice (1979) § 2.34). The payment of these obligations is a part of the economic return to the landowner. Thus, the limited record does not support the conclusion of the city council.[15]

It follows that the matter must be remanded to the Secretary for a hearing on the complete record (*Aluisi v. County of Fresno* (1958) 159 Cal.App.2d 823 [324 P.2d 920]) and appropriate findings (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506 [113 Cal.Rptr. 836, 522 P.2d 12]), pursuant to the independent judgment standard (Code Civ. Proc., § 1094.5, subd. (e)).

The judgment is reversed.

Miller, J., and Smith, J., concurred.

A petition for a rehearing was denied October 23, 1980, and the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied November 19, 1980.

---

[15]Our conclusions as to the Secretary's discretion and the scope of review are also supported by the most recent amendment of Government Code section 51283 (Stats. 1980, ch. 585). This amendment, effective January 1, 1981, added the following additional clarifying language to subdivision (c)(3): "In evaluating a request for a waiver, the secretary shall review the findings of the board or council, the evidence in the record of the local agency, *and any other evidence the secretary may receive* concerning the cancellation or waiver." (Italics added.)