[Civ. No. 28701. Fourth Dist., Div. One. June 29, 1984.]

HONEY SPRINGS HOMEOWNERS ASSOCIATION, INC., et al., Plaintiffs and Appellants, v.
BOARD OF SUPERVISORS OF SAN DIEGO COUNTY, Defendant and Respondent;
PRESENTING JAMUL et al., Real Parties in Interest and Respondents.

COUNSEL

Stephan C. Volker for Plaintiffs and Appellants.

Lloyd M. Harmon, Jr., County Counsel, Howard P. Brody, Chief Deputy County Counsel, and Sandra J. Brower, Deputy County Counsel, for Defendant and Respondent.

McCutchen, Doyle, Brown & Enersen, Barry P. Goode, Antonio Rossmann and Christine Sherry for Real Parties in Interest and Respondents.

OPINION

**WORK, Acting P. J.**—Honey Springs Homeowners Association, Inc., and the Sierra Club (petitioners) appeal a judgment denying their petition for a peremptory writ of mandate, seeking to vacate the Board of Supervisors of San Diego County (Board) resolution cancelling certain long-term land conservation contracts restricting development of rural acreage. The restricted land has now been purchased by investors intending to immediately develop it into a "clustered" residential/commercial community housing and providing a commercial center, security facilities and utilities for residents of 389 luxury homes.

We review the lawfulness of the Board's action in light of the constitutional and statutory effect of the California Land Conservation Act of 1965, "The Williamson Act" (Gov. Code, § 51200 et seq.),[1] as amended by the

---

[1] All statutory references are to the Government Code unless otherwise specified.

Robinson Act (Stats. 1981, ch. 1095, pp. 4249-4255) and article XIII, section 8 of the California Constitution. This statutory scheme restricts the early cancelling of agricultural and other open space preserve contracts in which landowners agree to not otherwise develop their lands for at least 10 years in exchange for property tax assessments lower than could otherwise be constitutionally obtained. As applicable here, early cancellation is prohibited statutorily unless the landowner's proposed alternative use both is consistent with the local government's general plan *and* will not result in "discontiguous patterns of urban development." Only the latter finding is contested.

Petitioners contend the Board breached its public obligation under section 51282.1, subdivision (f)(1) by cancelling three land conservation contracts to allow the investors to build a clustered housing development which petitioners claim will promote discontiguous patterns of "urban" development even though similar residential and commercial "clustered" development is classified as "rural" in the county's general plan. They claim the mere designation of a project as "rural development" by the local government does not fulfill the overriding statutory requirement that the development be contiguous to existing or soon to be developed "urban" areas and that constructing this massive residential and commercial cluster-type development miles from any similar existing or presently proposed development, will be the catalyst for the precise disorderly growth the Williamson Act was designed to curb. Alternatively, they contend the finding is not supported by the evidence because the record shows the project is in fact an urban development and is not contiguous to an urban area.

For the reasons which follow, we list a nonexclusive list of relevant factors to aid in determining whether a project meets the statutory characterization of "urban development"; we hold the contiguity requirement and its temporal nature requires the project be actually contiguous to existing urban development or property soon to be developed; we hold our construction of the phrase "urban development" satisfies the enforceable restriction requirement of article XIII, section 8 of the California Constitution; we find as a matter of law the Honey Springs Project is "urban" development; and we remand the matter to the Board to determine whether the project satisfies the contiguity requirement when applying the guidelines in this decision.

### FACTUAL AND PROCEDURAL BACKGROUND

The Honey Springs Ranch encompasses approximately 2,022 acres, including 1,422 acres subject to 3 land conservation contracts. It is located in a relatively remote rural area west of the Cleveland National Forest, five

miles southeast of Jamul, twenty-three miles east of downtown San Diego, and eight miles southeast of the "urban limit line" for the San Diego metropolitan area as designated by the county general plan.

In October 1979, Presenting Jamul (Presenting),[2] a real estate developer, purchased the ranch knowing it was restricted to non-developed uses for 10 years by existing Williamson Act contracts, but believing it could have the restrictions removed early to allow prompt development and sale of sites for residential units. The project's overall density averages approximately 5.2 acres per residence; however, the homes will be "clustered" on a portion of the property so the actual lot sizes range from 1 to 2.5 acres. More than 40 percent of the total acreage will be dedicated to permanent open space and up to 90 percent will be retained or restored to a natural, rural appearance. The luxury homes in this ambitious project feature passive and active solar design, situated around a 17-acre artificial lake. It further includes eight acres of commercial buildings, a fire station, equestrian facilities, security services, tennis courts, and other recreational amenities. Commercial uses include a convenience store, membership club, a restaurant (indoor and outdoor dining), cocktail lounge, health spa, drycleaners, homeowners association office, real estate sales, outdoor tennis courts, a pro shop, service station, boat rental office, security facilities, a beach, pool and recreational facilities.

Presenting's first application to cancel the agricultural preserve contracts was denied because it could not meet the Williamson Act requirement that it prove its project could not have been placed on available nearby lands not under land conservation contract.[3] On January 11, 1982, Presenting renewed its application within the "window-period" of the Robinson Act which amended the Williamson Act and temporarily eliminated the foregoing requirement. This time the Board unanimously approved the cancellation, finding: "the cancellation and alternative use will not result in discontiguous patterns of urban development because the property and project is [sic] properly categorized as 'rural' . . . [and] the alternative use is consistent with the applicable provisions of the San Diego County General Plan 1990 which was in effect October 1, 1981 . . . ."

Petitioners contend the Board incorrectly interpreted the findings requirement of section 51282.1 and, in any event, no substantial evidence supported its findings.

---

[2]The real parties in interest are Presenting Jamul, a California limited partnership, and Presenting, Inc., a California corporation.

[3]Previously, the Honey Springs project had been approved by the Jamul-Dulzura Community Planning Group and the San Diego County Planning Commission.

## Historical Background:
## The Williamson Act as Amended by the Robinson Act

■ The Williamson Act is a legislative effort to preserve open space and agricultural land through discouraging premature urbanization and, at the same time, to prevent persons owning agricultural and/or open lands near urban areas from being forced to pay real property taxes based on the greater value of that land for commercial or urban residential use, a factor which would force most landowners to prematurely develop. The act responds to the alarming phenomena in California of "(1) the rapid and virtually irreversible loss of agricultural land to residential and other developed uses . . . and (2) the disorderly patterns of suburban development [fn. omitted] that mar the landscape, require extension of municipal services to remote residential enclaves, and interfere with agricultural activities . . . ." (*Sierra Club* v. *City of Hayward* (1981) 28 Cal.3d 840, 850 [171 Cal.Rptr. 619, 623 P.2d 180].)[4]

Under the act local governments may, but are not required to, establish "agricultural preserves" (§ 51230), i.e., areas devoted either to agricultural use, recreational use, open space use, or the combination of any such uses (§ 51201, subds. (b), (d), (n) and (o)), by executing voluntary contracts

---

[4] Section 51220 provides: "The Legislature finds: [¶] (a) That the preservation of a maximum amount of the limited supply of agricultural land is necessary to the conservation of the state's economic resources, and is necessary not only to the maintenance of the agricultural economy of the state, but also for the assurance of adequate, healthful and nutritious food for future residents of this state and nation.

"(b) That the agricultural work force is vital to sustaining agricultural productivity; that this work force has the lowest average income of any occupational group in the this state; that their exists a need to house this work force of crisis proportions which requires including among agricultural uses the housing of agricultural laborers; and that such use of agricultural land is in the public interest and in conformity with the state's Farmworker Housing Assistance Plan.

"(c) That the discouragement of premature and unnecessary conversion of agricultural land to urban uses is a matter of public interest and will be of benefit to urban dwellers themselves in that it will discourage discontiguous urban development patterns which unnecessarily increase the costs of community services to community residents.

"(d) That in a rapidly urbanizing society agricultural lands have a definite public value as open space, and the preservation. in agricultural production of such lands, the use of which may be limited under the provisions of this chapter, constitutes an important physical, social, esthetic and economic asset to existing or pending urban or metropolitan developments.

"(e) That land within a scenic highway corridor or wildlife habitat area as defined in this chapter has a value to the state because of its scenic beauty and its location adjacent to or within view of a state scenic highway or because it is of great importance as habitat for wildlife and contributes to the preservation or enhancement thereof.

"(f) For these reasons, this chapter is necessary for the promotion of the general welfare and the protection of the public interest in agricultural land."

with property owners[5] restricting land use for an initial term of no less than 10 years. The contracts are automatically renewed each year unless notice of nonrenewal is given pursuant to section 51245. (§ 51244.) By agreeing to restrict the use of land, the landowner receives a reduced property tax assessment based upon the value of the land for its current use rather than its market value.

The required term of no less than 10 years, automatically annually renewed, was intended to guarantee a long-term commitment to agricultural and other open space use, to deny the tax benefits of the act to short-term speculators and developers of the urban land, and to insure compliance with the constitutional requirement of an "enforceable restriction." (*Sierra Club* v. *City of Hayward, supra,* 28 Cal.3d 840, 851.) A landowner may terminate his contract at any time by giving notice to the contracting governmental entity; however, he may not develop the land during the remaining contract term. (§ 51246.) On notice of nonrenewal, property taxes gradually return to the level of taxation upon comparable nonrestricted property during the remainder of the term of restriction. (Rev. & Tax. Code, § 426.)

Originally, a governmental entity had limited discretion to cancel a contract only if the cancellation was not inconsistent with the purposes of the Act *and* would be in the public interest. (Former § 51282.) Moreover, the Act further restricted the local entity's discretion by providing: "The existence of an opportunity for another use of land involved shall not be sufficient reason for the cancellation of a contract. A potential alternative use of the land may be considered only if there is no proximate, noncontracted land suitable for the use to which it is proposed the contracted land be put. [¶] The uneconomic character of an existing agricultural use shall likewise not be sufficient reason for cancellation of the contract. The uneconomic character of the existing use may be considered only if there is no other reasonable or comparable agricultural use to which the land may be put." (Former § 51282.) To further discourage premature cancellations, the Legislature required a cancellation fee (§ 51283) and later imposed an additional charge partially recapturing the landowner's accrued tax benefits. (§ 51283.1.)

Subsequently, in *Sierra Club* v. *City of Hayward, supra,* 28 Cal.3d 840, the Supreme Court shocked local governments, landowners and developers

---

[5]The Williamson Act is not limited to agricultural lands. The act was " '[o]riginally available only to owners of certain agricultural lands, [but] subsequent amendments shifted the emphasis of the Williamson Act to the preservation of open space in general, including virtually any land in nonurban use." (Comment, *The California Land Conservation Act of 1965 and the Fight to Save California's Prime Agricultural Lands* (1979) 30 Hastings L.J. 1859, 1865, fn. omitted; see Note, *Proposition 13: A Mandate to Reevaluate the Williamson Act* (1981) 54 So.Cal.L.Rev. 93, 100.)

(including Presenting) by insisting the cancellation provisions of the Williamson Act be construed narrowly, establishing that the propriety of cancellations should be reviewed by administrative mandamus, and declaring the nonrenewal procedure was the "preferred termination method" and the "intended and general vehicle for contract termination" (28 Cal.3d 840, 852, 853) and prohibited a local government from cancelling a contract unless the act's express prerequisites for contract cancellation were strictly satisfied. The court emphatically stated "cancellation is inconsistent with the purposes of the act if the objectives to be served by cancellation should have been predicted and served by nonrenewal at an earlier time, or if such objectives can be served by nonrenewal now." (*Id.*, at p. 855.) The Supreme Court also confirmed the governmental entity must determine whether cancellation serves the public interest, as well as make the necessary findings regarding the alternative use including (1) whether there is any proximate, noncontracted land suitable for the proposed use and, (2) whether, if the the land is uneconomic for agricultural use, there is any other reasonable or comparable agricultural use to which the land may be put. The court concluded the Legislature intended the cancellation provision be available only in "extraordinary situations in which the ordinary nonrenewal and expiration procedures would pose insurmountable obstacles to the accomplishment of pressing public needs." (*Id.*, at p. 864.)

In response to *Hayward,* several bills were introduced in the California Legislature in 1981, the majority of which were designed to countermand the decision, while Assemblyman Hannigan's bill attempted to codify its restrictive interpretation. In the Senate, Senator Boatwright introduced Senate Bill No. 836, an antithesis to the Hannigan bill, declaring in pertinent part "[n]o special circumstances to justify a cancellation need be shown" and which would transform cancellation into a routine and virtually unreviewable legislative decision. The Boatwright bill easily passed the Senate 21 to 13, and was forwarded to the Assembly Committee on Natural Resources. The Boatwright-Hannigan differences made compromise inevitable. The committee adopted a completely new text for the Hannigan bill (now designated Assem. Bill No. 2074), codifying much of *Hayward's* restrictive holding but offering a one-time-only, easy exit from the act to landowners.[6] Senator Boatwright sponsored the bill in the Senate.

---

[6]The coauthors of amended Assembly Bill No. 2074 included not only Assemblyman Hannigan, but also Assemblymen Robinson, Cortese and Marguth, all of whom had introduced bills designed to counteract *Hayward* and enhance local discretion in cancelling. The fact Robinson carried Assembly Bill No. 2074 as the principal author has persuaded at least one writer on the subject the "assignment symboliz[ed] the success of the Decision's opponents in at least neutralizing its more restrictive effects." (Widman, *The New Cancellation Rules Under the Williamson Act* (1982) 22 Santa Clara L.Rev. 589, 611 (hereinafter *The New Cancellation Rules*).) Widman states: "[s]ignificantly, even supporters of the Decision

Following Senate amendments, Assembly Bill No. 2074, the Robinson Act, was enacted for the declared purpose "not to weaken or strengthen the Williamson Act but simply to clarify and make the law workable in light of problems and ambiguities created by the Supreme Court decision in the case of Sierra Club v. City of Hayward, 28 Cal.3d 840." (Stats. 1981, ch. 1095, § 8, p. 4254.) The Robinson Act amended the Williamson Act to permit local governments to cancel a contract upon finding *either* it is consistent with the purposes of the act *or* the cancellation is in the public interest. (§ 51282, subd. (a).)[7] However, to prove consistency with the act, the Legislature *not only retained, but expanded* the requirement for detailed subfindings required by *Hayward.*[8]

Of relevance here, the Robinson Act created a "window period" during which a landowner seeking cancellation need satisfy only two of the required subfindings (§ 51282.1): (1) that the cancellation and alternative use will not result in discontiguous patterns of urban development, and (2) that the alternative use is consistent with the applicable provisions of the city or county general plan. (§ 51282.1, subd. (f).) This section intended to provide a one-time opportunity to correct inconsistent applications of the can-

---

came to accept the 'window' as a device for correcting the essentially retroactive impact of the Decision upon existing contracts entered into under a different sense of the law years earlier. [Fn. omitted.] The alternative of wholesale nonrenewals by landowners frightened or confused by the Decision appeared far less palatable. Opening the 'window' would at least let out the discontented before the new permanent rules for cancellation became the only path to cancellation.

"Whatever the considerations of fairness and policy behind amended A.B. 2074, the danger that S.B. 836 might actually gain support in the assembly created pressure that secured this initial compromise." (*The New Cancellation Rules, supra,* at p. 611.)

[7]Regarding cancellation in the public interest, section 51282, subdivision (c) provides in part: "For purposes of paragraph (2) of subdivision (a) cancellation of a contract shall be in the public interest only if the council or board makes the following findings: (1) that other public concerns substantially outweigh the objectives of this chapter; and (2) that there is no proximate noncontracted land which is both available and suitable for the use to which it is proposed the contracted land be put, or, that development of the contracted land would provide more contiguous patterns of urban development than development of proximate noncontracted land."

[8]Section 51282, subdivision (b) provides in pertinent part: "For purposes of paragraph (1) of subdivision (a) cancellation of a contract shall be consistent with the purposes of this chapter only if the board or council makes all of the following findings:

"(1) That the cancellation is for land on which a notice of nonrenewal has been served pursuant to Section 51245.

"(2) That cancellation is not likely to result in the removal of adjacent lands from agricultural use.

"(3) That cancellation is for an alternative use which is consistent with the applicable provisions of the city or county general plan.

"(4) That cancellation will not result in discontiguous patterns of urban development.

"(5) That there is no proximate noncontracted land which is both available and suitable for the use to which it is proposed the contracted land be put, or, that development of the contracted land would provide more contiguous patterns of urban development than development of proximate noncontracted land."

cellation provisions and to alleviate present and potential hardships, both for affected cities and counties and for affected landowners. The provisions of the "window period" legislation are alternative to the provisions for cancellation of contracts contained in the Williamson Act. (§ 51282.1, subd. (a).)[9]

Presenting renewed its application within the "window period."

During the appeal of this case, Assemblyman Robinson successfully carried another bill (Robinson Act II) through the Legislature for the avowed purpose of avoiding possible misinterpretations of the "window-period" cancellation provisions regarding applications which have been approved by county boards of supervisors or city councils and are subject to litigation which he believed might result in their wrongful denial. Robinson Act II thus declared the findings requirements of the "window period" "were and are satisfied if a local board or council has acted in accordance with Section 51280.1, as added by this act." (Stats. 1983, ch. 1296, § 1.) Section 51280.1 provides in its entirety: "As used in this chapter, the finding of a board or council that 'cancellation and alternative use will not result in discontiguous patterns of urban development' authorizes, but does not require, the board or council to cancel a contract if it finds that the alternative use will be rural in character and that the alternative use will result within the foreseeable future in a contiguous pattern of development within the relevant subregion. The board or council is not required to find that the alternative use will be immediately contiguous to like development. In rendering its finding, the board or council acts in its own discretion to evaluate the proposed alternative use according to existing and projected conditions within its local jurisdiction.

"The provisions of this section shall apply only to those proceedings for the cancellation of contracts which were initiated pursuant to Section 51282.1, and, consistent with the provisions of Section 9 of Chapter 1095 of the Statutes of 1981, shall apply to the same extent as the provisions of Section 51282.1, notwithstanding their repeal." (Stats. 1983, ch. 1296, § 2.)

---

[9]"The 'inconsistent' applications of the cancellation provisions, one may infer, arise from the [*Hayward*] Decision, on the one hand, and the historical practice of local agencies in granting cancellations under far less strict requirements, on the other. In relying upon local practice, many landowners may have entered the Act in the expectation that cancellation would not become the 'strictly emergency' affair that the supreme court later made it. The 'window' provisions were apparently intended to compensate for that disparity between landowners' expectations for cancellation and the reality of the Decision." (*The New Cancellation Rules, supra,* 22 Santa Clara L.Rev. at pp. 621-622.)

## The Legal Controversy: A Matter of Interpretation

It is conceded the Honey Springs project is consistent with the county's general plan. We are asked only to determine whether the Board correctly concluded that, because the Honey Springs project is defined as a *rural* development under its own general plan enacted to control county developmental growth patterns, it necessarily could not create a discontiguous pattern of *urban* development as that term is used in the Williamson Act, an enactment involving different far-reaching statewide concerns. In this regard, petitioners contend no development may be approved unless it is presently contiguous to existing urban development or to intervening parcels which soon will be developed. Respondents counter that the language "will not result in discontiguous patterns" permits "window" cancellations where the proposed alternative use is part of a pattern of indefinite long-term future development within the city or county, as well as where parcels are presently immediately adjacent to existing or imminent developments.[10]

## The Probative Legislative Intent Value of the Record

This litigation classically illustrates the difficulty in determining legislative intent when opposing factions each muster massive documentation, the majority of which constitutes unreliable and/or inadmissible documents of minimal probative value. The contradictory declarations of Assemblymen Hannigan and Robinson, two key legislators involved in enacting the Robinson Act, regarding the meaning of the language in dispute "fortifies judicial reticence to rely on statements made by individual members of the Legislature as an expression of the intent of the entire body." (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 258 [104 Cal.Rptr. 761, 502 P.2d 1049].) Not only do we have the postenactment declarations of Assemblymen Robinson and Hannigan, we have special interest correspondence to the Governor urging his signing of the bill; the postenactment declarations of special interest lobbyists describing individual perceptions of the underlying legislative intent of the disputed language in the Robinson Act; and the postenactment declaration of a director of the California Department of Conservation reflecting her understanding of the effect of the Robinson Act induced her to recommend the bill become

---

[10]As to our scope of review in an administrative mandamus action where no limited trial de novo is authorized by law, the trial and appellate courts occupy in essence identical positions with regard to the administrative record, exercising the appellate function of determining whether the record is free from legal error. (*Sierra Club* v. *City of Hayward, supra,* 28 Cal.3d 840, 849, fn. 2; *Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907, 915-916 [80 Cal.Rptr. 89, 458 P.2d 33].)

law. We review the applicable rules of statutory construction[11] and their effect upon this voluminous record.

---

[11]The most fundamental rule of statutory construction is that "the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672]; *California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856]; *Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) The court first looks to the language of the statute, attempting to give effect to the usual, ordinary import of that language and seeking to avoid making any language mere surplusage. Significance if possible should be attributed to every word, phrase, sentence and part of an act in pursuance of the legislative purpose. (*Ibid.*) "[T]he various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole." (*Ibid.*) Further, wherever possible, the statute will be construed in harmony with the Constitution. (*California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575, 594 [131 Cal.Rptr. 361, 551 P.2d 1193].) The provision must be given a reasonable and common sense interpretation consistent with the apparent purpose and intention of the lawmakers, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity. (*United Business Com.* v. *City of San Diego* (1979) 91 Cal.App.3d 156, 170 [154 Cal.Rptr. 263]; *City of Costa Mesa* v. *McKenzie* (1973) 30 Cal.App.3d 763, 770 [106 Cal.Rptr. 569].) " 'The court should take into account matters such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction.' " (*Cossack* v. *City of Los Angeles* (1974) 11 Cal.3d 726, 733 [114 Cal.Rptr. 460, 523 P.2d 260], quoting *Alford* v. *Pierno* (1972) 27 Cal.App.3d 682, 688 [104 Cal.Rptr. 110]; *United Business Com.* v. *City of San Diego, supra,* at p. 170.

To ascertain the legislative intent behind a statutory amendment, we may rely upon committee reports provided they are consistent with a reasonable interpretation of a statute. (*Smith* v. *Rhea* (1977) 72 Cal.App.3d 361, 369 [140 Cal.Rptr. 116]; *People* v. *Swinney* (1975) 46 Cal.App.3d 332, 342 [140 Cal.Rptr. 116], disapproved on other grounds in *People* v. *Zamora* (1976) 18 Cal.3d 538, 564-565, fn. 26 [134 Cal.Rptr. 784, 557 P.2d 75]; *In re Marriage of Bjornestad* (1974) 38 Cal.App.3d 801, 805 [113 Cal.Rptr. 576], disapproved on other grounds in *In re Marriage of Lucas* (1980) 27 Cal.3d 808, 815 [166 Cal.Rptr. 853, 614 P.2d 285].) Regarding reliance upon statements and letters of individual legislators in construing a statute, "we do not consider the motives or understandings of individual legislators who cast their votes in favor of it. [Citations.] Nor do we carve an exception to this principle simply because the legislator whose motives are proffered actually authored the bill in controversy [citation]; no guarantee can issue that those who supported his proposal shared his view of its compass." (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589-590 [128 Cal.Rptr. 427, 546 P.2d 1371]; *California Teachers Assn.* v. *San Diego Community College Dist., supra,* 28 Cal.3d 692, 699-700.) "A legislator's statement is entitled to consideration, however, when it is a reiteration of legislative discussion and events leading to adoption of proposed amendments rather than merely an expression of personal opinion. [Citations.] The statement of an individual legislator has also been accepted when it gave some indication of arguments made to the Legislature and was printed upon motion of the Legislature as a 'letter of legislative intent.' " (*Id.,* at p. 700.) Correspondence within the Governor's file on a bill from interested parties "does not represent the intent of the Legislature . . . [where] it is neither a statement of the legislator nor a report to the Legislature from the bill's proponents." (*People* v. *Stepney* (1981) 120 Cal.App.3d 1016, 1020, fn. 4 [175 Cal.Rptr. 102].) "Nor will the courts give much weight to post-enactment statements by administrators or other public officials to their understanding of the underlying legislative intent, even though such persons may have actively supported the measure and irrespective of the fact that the subject matter of the enactment may have directly involved their official responsibilities under existing law. [Fn. omitted.]" (58 Cal.Jur.3d (1980) Statutes, § 163,

█ Preliminarily, regarding Robinson Act II, we are not bound by its construction of the disputed finding; for "[o]ne session of the legislature has no power, strictly speaking, to construe the acts of a former session . . . . [Fn. omitted.]" (58 Cal.Jur.3d (1980) Statutes, § 171, p. 579.) Rather, it is firmly established statutory construction is a judicial function within which the "courts have consistently held that 'declaratory or defining statutes are to be upheld . . . as an exercise of the legislative power to enact a law for the future.' [Citations.]" (*People* v. *Cuevas* (1980) 111 Cal.App.3d 189, 199 [168 Cal.Rptr. 519].) In other words, "[t]he right to construe a preexisting statute belongs to the judiciary . . . [as it] may not be forced to construe such a statute in accordance with legislative interpretation though the Legislature has a right to define the terms of the statute for the future." (*Cal. Emp. Stab. Com.* v. *Chichester etc. Co.* (1946) 75 Cal.App.2d 899, 901 [172 P.2d 100].) Consequently, the Legislature " 'may not revise the operation of an existing law in the form of an amendatory statute to affect past transactions.' " (*People* v. *Cuevas, supra,* 111 Cal.App.3d at p. 199, quoting *Cal. Emp. Stab. Com.* v. *Chichester etc. Co., supra,* 75 Cal.App.2d at p. 901.) "Although a legislative expression of the intent of an earlier act is not binding upon the courts in their construction of the prior act, that expression may properly be considered together with other factors in arriving at the true legislative intent existing when the prior act was passed." (*Eu* v. *Chacon* (1976) 16 Cal.3d 465, 470 [128 Cal.Rptr. 1, 546 P.2d 289]; *Friends of Lake Arrowhead* v. *Board of Supervisors* (1974) 38 Cal.App.3d 497, 506 [113 Cal.Rptr. 539]; see *County of Sacramento* v. *State of California* (1982) 134 Cal.App.3d 428, 433-434, fn. 5 [184 Cal.Rptr. 648]; *People* v. *Cuevas, supra,* at p. 199.) As the court in *Del Costello* v. *State of California* (1982) 135 Cal.App.3d 887, 893, footnote 8 [185 Cal.Rptr. 582], succinctly summarized, "[t]he Legislature has no authority to interpret a statute. That is a judicial task. The Legislature may define the meaning of statutory language by a present legislative enactment which, subject to constitutional restraints, it may deem retroactive. But it has no legislative authority simply to say what it *did* mean. Courts do take cognizance of such declarations where they are consistent with the original intent. '[A] subsequent expression of the Legislature as to the intent of the prior statute, although not binding on the court, may properly be used in determining the effect of a prior act. [Citations.]' [Citation.] The Legislature may also, as it did here, define the term 'amount owing' ' "as an exercise of the legislative power to enact a law for the future." [Citations.]' [Citation.] Our task is to discern the intent of the statute from its applicable language and context."

---

p. 567; *Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880, 887 [153 Cal.Rptr. 842, 592 P.2d 329].)

Guided by the applicable rules of statutory construction, we find that of those materials probative of legislative intent, few show the intent of the *entire* legislative body. For instance, casting aside Assemblyman Hannigan's declaration, the Sierra Club relies upon the analyses of Assembly Bill No. 2074 prepared and circulated in the Senate and certain enrolled bill reports it believes coincide with its own broad construction of the phrase "urban development."[12] However, we find the failure to include the term "urban" when speaking of discontiguous development in each of these reports of little significance, because each legislator also had a copy of the bill containing the adjective "urban" modifying the word "development." Had an analysis or enrolled bill report of a proposed statute making it a misdemeanor to paint your barn red, failed to refer to the color red, we would not construe the underlying legislative intent as making it a misdemeanor to paint your barn any color. Simply stated, we would presume the legislators were cognizant of the word "red" when considering the bill before them.

Consequently, most materials presented only show there was compromise between the respective supporters of the Hannigan bill and the Boatwright bill. They offer no clue as to the precise meaning attached by the Legislature to the language in controversy. Accordingly, we employ the cited fundamental rules of statutory construction without relying upon the proffered extrinsic "aids."

### Defining the Phrase "Urban Development"

 In construing the phrase "urban development," we consider the Robinson Act in light of the Williamson Act of which it is a part. The Robinson Act's parallel use of the phrase "discontiguous patterns of urban development" as a permanent finding and also as one of the "window-period" findings suggests we interpret the phrase uniformly, consistent with

---

[12]The staff analysis prepared by the Senate Committee on Local Government states in pertinent part: "The local agency may grant tentative approval for cancellations of a contract if it makes the following findings: 1. the cancellation and alternative uses will not result in a pattern of *'discontiguous'* development, and 2. the alternative uses are consistent with the general plan in effect on October 1, 1981, or as amended after that date under proceedings which were initiated prior to January 1, 1982." (Italics added.) The digest on Assembly Bill No. 2074 prepared by the Senate Republican Caucus contains the identical language. Moreover, the enrolled bill report prepared by the State Office of Planning and Research described the "window" cancellation procedure as follows: "If the county or city wants to cancel a contract, it would have to make two findings: that cancellation will not produce *'discontiguous'* development; and, that development of the land is consistent with the local general plan." (Italics added.) Similarly, the Department of Finance's enrolled bill report stated: "Assembly Bill No. 2074 also establishes 'special contract cancellation procedures' that for a limited time would allow local agencies to cancel Williamson Act contracts if they found that: (1) the cancellation and alternative use would not result in *discontiguous patterns of development*, and (2) the alternative use is consistent with the city or county general plan. . . ." (Italics added.)

the underlying objectives of the Williamson Act, because the Robinson Act declares its purpose is "not to weaken or strengthen the Williamson Act but simply to clarify and make the law workable in light of problems and ambiguities created by the California Supreme Court decision in the case of Sierra Club v. City of Hayward . . . ." (Stats. 1981, ch. 1095, § 8, p. 4254.) The Legislature's delicate compromise of requiring the two cited findings (instead of simply requiring no findings) during the "window period" fortifies our belief the requirement was imposed to guarantee accomplishing the Williamson Act's principal objectives. Accordingly, although the "window period" should be construed liberally to provide a simplified exit opportunity for "dissatisfied" contract holders, that construction must be tempered by the objectives of the Williamson Act.

The Supreme Court in *Sierra Club* v. *City of Hayward, supra,* 28 Cal.3d 840, 850, stated the Williamson Act was enacted to curb "the rapid and virtually irreversible loss of agricultural land *to residential and other developed uses* . . . ." (Italics added.) ▓ In reaching its conclusion, the court considered the effect of the findings required by section 51220, subdivisions (b) and (c) (*ante,* fn. 4), which employ such language as "urban uses," "discourage discontiguous urban development patterns," "a rapidly urbanizing society," and "urban or metropolitan developments." Nothing in the Robinson Act suggests the Legislature intended the term "urban development" in section 51282.1, subdivision (f)(1) to have a meaning different from the same or a similar phrase in section 51220. To construe the term "urban development" more narrowly in section 51282.1 would defeat the underlying purpose of the Williamson Act, contrary to express intent of the Robinson Act. A narrow construction would permit the very condition the Williamson Act was designed to curb—disorderly patterns of suburban development, also known as "leapfrog" development or "urban sprawl," characterized by scattered, low-density, single family subdivisions.[13]

The inevitable effect of encouraging clustered residential development in rural areas is effectively the same as urban development; for, regardless whether a subdivision consists of one unit per acre or averages one unit per

---

[13]"[U]rban growth does not proceed in a gradual, contiguous manner, progressing slowly outward from the central city. Rather, expanding communities have tended to grow in checkerboard fashion, with development jumping from area to area within the region in a process known as leapfrog development. Generally, land decreases in cost as the distance from an urban center increases. Developers therefore tend to bypass (leapfrog) high-priced parcels adjacent to urbanized areas, in favor of lower-priced outlying lands. This pattern of scattered, noncontiguous development merely serves to increase the rate at which California's prime agricultural lands are urbanized." (Comment, *The California Land Conservation Act of 1965 and the Fight to Save California's Prime Agricultural Lands, op.cit. supra,* at p. 1864, fn. omitted.)

five acres, it removes the land from agricultural or protected open space uses. Clustered residential development is inevitably accompanied by a host of necessities and amenities including utilities, commercial facilities, roadways, lot fences, etc., which combine to preclude open space uses regardless of density. Moreover, the injurious effect of such development in rural areas upon protected open space lands is far greater than urban development, because the low density of the former is more inefficient, consuming relatively more acreage of open space land than its high density counterpart. Because of these concerns, petitioners argue we must presume the Williamson Act includes all developed land uses within its term, "urban development."

However, petitioners' argument fails in light of settled rules of statutory construction and the general scheme of California land use law. Here, the Legislature consciously employed the adjective "urban" in describing the noun "development." Urban is defined as "of, relating to, characteristic of, or taking place in a city . . . constituting or including and centered on a city . . . of, relating to, or concerned with an urban and specif. a densely populated area . . . belonging or having relation to buildings that are characteristic of cities . . . ." (Webster's Third New Internat. Dict. (unabridged 1968) p. 2520, col. 3; see also Black's Law Dictionary (5th ed. 1979) p. 1381, col. 1, defining urban as "[o]f or belonging to a city or town. Within city limits . . ."; see also 91 C.J.S. "URBAN" p. 512.) The only judicial California definition we find echoes this definition. (*South Pasadena v. San Gabriel* (1933) 134 Cal.App. 403, 409-410 [25 P.2d 516].)[14] A practical definition appears in *City of Philadelphia v. Brady* (1931) 104 Pa. Super. 79 [157 A. 694, 695-696] (affd. 308 Pa. 135 [162 A. 173, 174]), regarding liability for assessment purposes. Quoting *City of McKeesport v. Soles* (1896) 178 Pa. 363 [35 A. 927, 929-930], the court held: " 'Whether the particular property . . . is to be considered "rural" or "city", depends largely upon its surroundings and the character of the property in the neighborhood. If the buildings and improvements in the neighborhood are few and scattered; they partake of the character of the country, rather than of the city or town, and are occupied by persons engaged in rural pursuits— the locality should be considered rural. On the other hand, if the houses and improvements partake of the character of the city or town, and are mainly occupied by persons engaged in city pursuits, the locality should be considered as city and not rural. A locality which is laid out in small lots, of the usual size for city or town lots and partly built upon with city improvements,

---

[14]Courts of other jurisdictions similarly track the dictionary definition of "urban." (See, e.g., annotations within 43A Words and Phrases (1969) "Urban" and related phrases, p. 235, as supplemented by the 1983 cumulative annual pocket part, pp. 33-34.)

such as paved streets and gas or water pipes, should be considered in the class of city property.'"

Title 42 of the United States Code, section 1500d-1 regarding public health and welfare in the preservation of open-space land, defines "urban area" as: "any area which is urban in character, including those surrounding areas which, in the judgment of the Secretary, form an economic and socially related region, taking into consideration such factors as present and future population trends and patterns of urban growth, location of transportation facilities and systems, and distribution of industrial, commercial, residential, governmental, institutional, and other activities." Finally, in construing "urban," we perceive the differences between living in urban and rural areas are not so marked today as during the early years of this century, because inhabitants of many rural locations now enjoy (indeed expect) available transportation, light, power, water and sanitary facilities and services, just as their counterparts in urban centers. (1 McQuillin, Municipal Corporations (3d. ed. 1971) § 1.07, p. 9.)

Unlike the descriptive term "urban" which has no fixed, objective and easily ascertainable meaning, "development" carries its ordinary meaning, expanded in section 65927 to include almost any physical improvement of land by grading the earth and erecting structures.

We conclude the phrase "urban development" as used in the relevant state statutes, has no fixed, precise definition. Whether a residential development is urban or rural therefore, must be determined by evaluating factors relating to the varying characteristics of individual projects. Employing these guidelines, local governmental entities can determine whether the cancellation of Williamson Act contracts will permit urban development resulting in a discontiguous pattern of urban development *within the context of the state's conservation plan.*[15]

Presenting contends the only relevant factors are those the San Diego County Board of Supervisors now uses to determine whether a development or area is rural or urban in character for its own parochial land-planning purposes. These include density, surrounding development, proximity to or potential of becoming an incorporated area, existing public facilities, water availability in the region, steepness of natural slope, minimum parcel sizes, availability of public transit, ability to cluster housing to preserve open space, height of buildings, on-site sewage capacity, landscaping, lighting,

---

[15]Our view is not shared by the dissent which would subordinate the state's interest in these land-use contracts to that of the local governmental entity's growth management plan.

space between structures, proximity of employment centers, preservation of open space easements, size of area to be served by commercial facilities, the attractiveness of commercial facilities to regional travelers, and the size of signs.

Petitioners list other characteristics of a development bearing directly on its compatability with open-space values of the affected land, including residential density, lot size, length and width of paved streets, amount of traffic generated, presence of commercial or industrial development, presence of urban infractures (i.e., public water supply, sewer, fire, police, schools, and attendant facilities), and the general impact of the proposed development on the scenic, recreational, wildlife or agricultural values and uses the Williamson Act is designed to protect.[16] All these factors and considerations are probative to a varying degree of whether a development is either urban or rural. Although the respective weight given to each of these factors enumerated in these nonexclusive lists will vary among themselves and from county to county, we believe using this definitional approach to identify "urban development," will allow an accurate characterization of the development, consistent with the objectives of preserving open space, insuring orderly development of our urbanized areas, and recognizing the reasonable expectations of all concerned parties.

Further, our construction of the term "urban development" comports with California land use law of which the Williamson and Robinson Acts are integral parts. California has developed two strong and equally dignified doctrines, including (1) the need for principled planning according to general practices and policies required by the Legislature (e.g. adoption of a general plan and consistency of local decisions with that general plan), and (2) the authority of each local jurisdiction to apply state-wide goals and plan the substance of their local land use subject to only limited state oversight. (See § 65030.1.) Consequently, the Office of Planning and Research (OPR)

---

[16]Similarly, OPR in a memorandum entitled "Opening the Williamson Act Window: Implementing AB 2074" (Dec. 1, 1981), at pages 6-7, suggests: "In many communities, the following land uses can be typically considered 'urban development':
 "commercial,
 "industrial,
 "public facilities and services (e.g., airports, civic centers, military bases, gas processing and storage plants, water and sewage treatment plants, schools),
 "resource extraction (e.g., gravel pits, quarries)
 "residential (at densities of one or more dwelling units per acre).
 "Because this phrase may be one of the most controversial aspects of the new law, and to avoid the uneven application of this test, local officials should seriously consider adopting their own definition before they act on any cancellation applications. A minute item or resolution specifying the standards to be used would help their staffs anticipate elected officials' policies in a fair and equitable manner."

was established and directed to prepare such land-use guidelines of an advisory nature to each city and county. (§ 65040.2.)[17] The OPR *General Plan Guidelines* provide: "In California the State has delegated much of the responsibility of resolving the conflicts to local governments, with the central mechanism for balancing policies and making necessary trade-offs being the local general plan." (OPR *General Plan Guidelines* (1982) p. XXIV.)

Concerning the adoption and administration of zoning laws, ordinances, rules and regulations, section 65800 states in pertinent part: "[T]he Legislature declares that in enacting this chapter it is its intention to provide only a minimum of limitation in order that counties and cities may exercise the maximum degree of control over local zoning matters." As the court in *Kelsey* v. *Colwell* (1973) 30 Cal.App.3d 590, 594 [106 Cal.Rptr. 420], aptly summarized: "The Williamson Act embraces statewide purposes; it was adopted by the Legislature to preserve open spaces, to conserve irreplacable agricultural lands and to eliminate socio-economic problems associated with urban sprawl. (§ 51220.) Nevertheless, the state aims envisioned by the law, by necessity, must be correlated with local environmental and community needs. And, by implication, the state objectives must be correlated with long-range community planning . . . ."[18]

Petitioners argue developmental pressure on the urban fringe land comes largely from speculators such as Presenting, interested in creating lucrative low-density subdivisions by purchasing the generally cheaper acreage far removed from those more expensive lands nearer to existing developed urban areas and already subject to the inflated land value caused by encroaching urbanization. They argue it is especially true here where the developer benefits both from the rural location of the acreage and the land's additional depressed value resulting from long-term use restrictions facially preventing early development. Petitioners further contend low-density projects also prematurely destroy open space because, although high-density housing and

[17]OPR has primary responsibility to assure the orderly operation of the state-wide process of environmental policy development and implementation. OPR has no direct operating or regulatory powers over land use, public works or other state, regional or local projects or programs (§ 65035); however, it has statutory responsibility for coordinating the technical assistance provided by state departments and agencies in regional and local planning to obtain consistency with statewide environmental goals and objectives, to develop long-range policies to assist state and local agencies' immediate growth and development problems in urban areas, and to provide planning assistance to local planning agencies. (See generally § 65040.) The degree of specificity and level of detail in the discussion of each element within the general plan will reflect local conditions and circumstances. (§ 65302.1.)

[18]Our determination of the role played by local governments in determining what constitutes "urban development" is consistent with the views entertained by OPR in the memorandum cited in footnote 16, *ante,* and the State Department of Conservation in its enrolled bill report submitted to the Governor on Assembly Bill No. 2074.

commercial uses occasionally replace fringe open space, this is the exception rather than the rule. (See Land, *Unraveling the Rurban Fringe: A Proposal for the Implementation of Proposition Three* (1968) 19 Hasting L.J. 421, 424, citing Snyder, *A New Program for Agricultural Land Use Stabilization: The California Land Conservation Act of 1965* (1966) 42 Land Econ. 29, 31.) They urge Presenting's construction of the act would actually encourage low-density suburban expansion, emphasizing the same contiguity requirement appears both in the "window" as well as the permanent cancellation provisions. Further, they point out that focusing on the relative density of the proposed development creates a situation where high-density developments, more efficient for land conservation purposes, will be avoided because they will be characterized as "urban," while sprawling suburban projects consuming much greater amount of open space land per dwelling unit, will become the "safe" way to obtain early removal of land use restrictions.

We believe, however, that Presenting's proposal of low-density, clustered developments accompanied by the dedication of surrounding lands to open space and restricted by local growth management plans to preserve the rural character of the surrounding lands, is a practical response to the competing state interests of the preserving open space and the guaranteeing of adequate housing for its residents through orderly development.

THE TERMINOLOGY "THE CANCELLATION AND ALTERNATIVE USE WILL NOT RESULT IN DISCONTIGUOUS PATTERNS OF URBAN DEVELOPMENT" REQUIRES ACTUAL CONTIGUITY TO AN EXISTING URBAN DEVELOPMENT OR PROPERTY SOON TO BE DEVELOPED

With regard to the contiguity aspect of the disputed finding, we believe the Robinson Act authorizes "window" cancellations where the alternative use will be integrated into similar development in the reasonably near future. We find the term "discontiguous patterns of urban development" was chosen pragmatically, a legislative recognition that development from an urban area does not always occur in smooth, sequential progression. Accordingly, contiguity must be measured in relation to existing urban development and will be established only where proposed development is, or as the result of development of intervening parcels will soon be, contiguous to existing urban development.

We do not adopt Presenting's more relaxed interpretation, in essence requiring mere consistency with indefinite speculative future development envisioned within the city or county general plan. To do so would eliminate the state's contiguity requirement in favor of a vague standard of foresee-

ability. Actual contiguity to existing urban development, either at the time of cancellation or soon thereafter, must be the standard, because any appreciable delay between construction of the alternative use and achievement of contiguity results in the very evil the contiguity requirement was intended to abolish, i.e., premature and disorderly patterns of suburban development.
We believe the contiguity requirement may be satisfied by showing the owners of intervening parcels have the current ability and intent to develop their land within a reasonable time. The legislative use of the phrase "will not result in" does not imply a legislative intent to bestow upon a local agency any greater latitude in determining the ultimate ramification of its land-use decision. To avoid mere prophecy, we hold such a finding must be based upon substantial evidence establishing not only consistency with local plans and zoning, but also the present intent of the intervening landowners to soon develop their land.[19] Since delay would thwart the objectives of the Williamson Act, the period of abeyance clearly cannot exceed nine years, the termination period within the nonrenewal procedure, because "cancellation is inconsistent with the purposes of the act if the objectives to be served by cancellation . . . can be served by nonrenewal now." (*Sierra Club* v. *City of Hayward, supra,* 28 Cal.3d 840, 855.) Otherwise, what constitutes a reasonable and permissible period of time depends upon the factual circumstances of each individual case.[20]

In summary, we believe our interpretation of the disputed finding permits a reasonable and practical construction which will safeguard the primary

[19]Our construction of the contiguity requirement is slightly more lax than that definition offered by OPR in its memorandum "Opening the Williamson Act Window: Implementing Assembly Bill No. 2074," *supra,* at page 6, which suggested: "Boundary laws often require that land be 'contiguous' before it can be annexed to a city or special district, without ever defining that term. (For library districts, see Education Code, section 19401; Regional Park Districts, Public Resources Code, section 6110; and cities, Government Code, sections 35033 and 36033.5.) In general, dictionaries define 'contiguous' to mean 'being in actual contact,' 'touching,' and 'adjoining, with nothing similar intervening.'

"Local officials can construct a definition of 'discontiguous patterns of urban development,' from these statutory and dictionary definitions of 'contiguous,' and from a common sense use of their own local general plans. To result in contiguous patterns of urban development, the property for which cancellation is sought should be:

"Contiguous at at least one point,

"To existing urban development *or* to lands for which all final discretionary permits have been issued (e.g., final parcel maps, final subdivision maps),

"As of the date the finding is made."

[20]Regarding contiguity, common sense again mandates that some intervening features should not be considered as destroying contiguity, such as roadways or rural rights of way, utilities easements, natural divisions (rivers, narrow gullies, mountain peaks), and any land which will never be improved. Indeed, permanent open space should not be considered in determining contiguity, in order to insure its incorporation *within* the final pattern of urban development. (See *The New Cancellation Rules, supra,* 22 Santa Clara L.Rev. at p. 626, fn. 141.)

objectives of both the Williamson Act and the Robinson Act. As noted above, the Robinson Act was not enacted merely to ease cancellation restrictions for a limited time and to weaken the enforceably restrictive nature of agricultural preserve contracts. To the contrary, it also established a new set of permanent limitations on contract cancellation requiring, of pertinence here, five new subfindings when determining a cancellation would be consistent with the Williamson Act. The Robinson Act is a delicate compromise of competing environmental, farming, governmental, and development special interest groups waiving only three of those restrictions during the "window" period; the Legislature expressly declined to waive either the contiguity or the general plan consistency requirements. Since the retained findings are also permanent restrictions on cancellation, we construe them uniformly to further the objectives of the Williamson Act.

THE PHRASE "URBAN DEVELOPMENT" MUST BE CONSTRUED SO AS TO SATISFY THE "ENFORCEABLE RESTRICTION" CONSTITUTIONAL REQUIREMENT

Article XIII, section 8 is the enabling amendment of the Williamson Act,[21] and requires any Williamson Act contract to *enforceably restrict* the use of contracted land.

Further, the Legislature provides in section 51252 that: "Open-space land under a contract entered into pursuant to this chapter shall be *enforceably restricted* within the meaning and for the purposes of Section 8 of Article XIII of the State Constitution and shall be enforced and administered by the city or county in such a manner as to accomplish the purposes of that article and of this chapter." (Italics added.)

Consequently, petitioners argue not only must the act's cancellation restrictions be construed to fulfill the constitutional mandate to protect open space, they must also be interpreted so as to require enforceable restrictions. Not to do so violates the California Constitution, article XIII, section 1 which mandates all real property be assessed and taxed on the basis of its fair market value. The Supreme Court observed: "Finally, it is the purpose of the act to extend tax benefits to those who voluntarily subject their land to 'enforceable restrictions.' (Cal. Const., art. XIII, § 8.) If cancellation were a simple matter of showing that the restricted land is now more valu-

---

[21]Article XIII, section 8 states: "To promote the conservation, preservation, continued existence of open space lands, the Legislature may define open space land and shall provide that when this land is *enforceably restricted,* in a manner specified by the Legislature, to recreation, enjoyment of scenic beauty, use or conservation of natural resources, or production of food or fiber, it shall be valued for the property tax purposes only on a basis that is consistent with its restrictions and uses." (Italics added.)

able for developed use, we doubt whether Williamson Act contracts could qualify as 'enforceable restrictions' making the land eligible for taxation on use value rather than market value under the Constitution. Lax cancellation procedures might thereby defeat the intent of the Legislature to reduce the taxes on agricultural land in return for long-term binding commitments." (*Sierra Club* v. *City of Hayward, supra,* 28 Cal.3d 840, 855.)

■ Upon reviewing the cancellation procedures of the Williamson Act, as modified by the Robinson Act, highlighted by the stringent findings required under the permanent provisions, our construction of the disputed finding and the nonwaiverability of the cancellation fee for "window-period" cancellations, we find the statutory procedures satisfy the enforceable restriction requirement.

Our interpretation of the required finding does not make the land-use contract cancellation provisions so liberal as to be unconstitutional. Viewing the permanent cancellation provisions in their entirety, the expanded requirement of more precise findings when applied by the local governmental entity to a given situation in accordance with the spirit and purposes of the Williamson Act, insures facial constitutional validity in accordance with article XIII, section 8. These findings detail and address all considerations necessary to assure any cancellation will further the purposes of the act.[22] To further prevent speculators and developers from using the Williamson Act as a "tax shelter," it imposes a cancellation fee (§ 51283) or an additional deferred tax (§ 51283.1), whichever is greater. Granted, under the permanent provisions, these penalties may be waived by the local governmental entity (§§ 51283, subd. (c) and 51283.1, subd. (e)); however, such waivers must be in the public interest and waiver of the cancellation fee must be approved by the Secretary of the Resources Agency.[23]

We find the "window-period" cancellation provisions are also sufficiently enforceably restrictive to promote the underlying objectives of the Williamson Act, the Constitution and the Robinson Act. Although we believe the proper application of the findings as construed in this opinion assures con-

---

[22]See section 51282, subdivision (b)(1) through (5) at footnote 8, *ante.*

[23]"[T]he function of the cancellation fee . . . [is to deter] the landowner . . . [from] seek[ing] cancellation during the early years of the contract and to ensure that owners who execute agreements are not speculators looking for a short-term tax shelter. [Citations.] This deterrent function has been consistently emphasized [fn. omitted] . . . .

"No doubt, the Legislature recognized that it would be very difficult for the local agency to approve a cancellation, and then not waive the penalty, in the light of potential political pressures. The Secretary is not subject to local political consequences and can ensure that the statewide purpose of conserving agricultural land is fulfilled." (*Dorcich* v. *Johnson* (1980) 110 Cal.App.3d 487, 496-497 [167 Cal.Rptr. 897].)

stitutional compliance with the enforceable restriction requirement, the "window-period" cancellation clauses specifically prohibit waiver of the cancellation fee. (§ 51282.1, subd. (i).)[24]

### THE HONEY SPRINGS PROJECT IS "URBAN" DEVELOPMENT

█ Using those principles we adopt above, our review of the entire record for substantial evidence to support the Board's finding (Code Civ.

---

[24]Here, the cancellation fee imposed was $239,395, consisting of a statutory cancellation fee of $130,050 and a county cancellation fee of $109,345 approximately three times the amount of tax savings ($76,899), including interest compounded at 6 percent per annum, by the landowner during the entire time the land was under contract. Moreover, the statutory cancellation fee alone ($130,050) was approximately 1.69 times greater than the total tax savings with interest. (We note these figures reflect recognition of tax savings and interest compounded annually under one Williamson contract entered into in 1969, several years under which the state and the county had received full benefit of their bargain.)

Our impression of the enforceable restrictive nature of nonwaiveable cancellation fees during the "window period" is consistent with California Administrative Code, title 18, section 51 (adopted Cal. Admin. Register 70, No. 9, Feb. 28, 1970) entitled "Agreements Qualifying Land for Assessment as Open Space Lands." It provides in pertinent part: "An agreement made pursuant to the Land Conservation Act of 1965 prior to November 10, 1969, qualifies for restricted-use assessment pursuant to sections 423 and 426 of the Revenue and Taxation Code if, taken as a whole, it provides restrictions, terms, and conditions which are substantially similar to or more restrictive than those which were required by such act for a contract at the time the agreement became effective or which have subsequently been made less restrictive by the Legislature.

"(a) Mandatory Provisions. . . .

"(b) Disqualifying Provisions. . . .

"(c) Cancellation. . . .

"(d) Cancellation Fee-Waiver or Deferral. . . .

"(e) Other Provisions. . . .

"(f) Substantial Similarity. An agreement having a provision which is more restrictive than required by the Land Conservation Act of 1965 for a contract may qualify even though it is deficient in some other respect. The mandatory provisions of subparagraph (a), however, are minimum requirements which if deficient cannot be compensated for from some other source. Similarly, the disqualified provisions of subparagraph (b) are such a substantial departure from the statutory provisions for a contract that their existence cannot be offset by other more restrictive provisions. A deficiency in the procedures set forth in subparagraphs (c) and (d) or in the conditions in subparagraph (e) may be compensated for by other more restrictive provisions except that, with respect to subparagraphs (c) and (d), an agreement that contains a cancellation provision cannot dispense with basic requirements of (1) a public hearing on a cancellation request of which the public is given notice and (2) findings by the board or counsel based on the evidence.

"*An agreement that does not allow a county or city to waive the cancellation fee under any circumstances is more restrictive than the requirements of the Land Conservation Act for a contract.* Such an agreement is substantially similar to a contract even though it also allows a reduction of the cancellation fee after notice of nonrenewal has been given by the proportion that the number of whole years remaining until expiration of the agreement bears to ten." (Italics added.)

" 'Consistent administrative construction of a statute over many years, particularly when it originated with those charged with putting the statutory machinery into effect, is entitled to great weight . . . .' " (*Gay Law Students Assn.* v. *Pacific Tel. & Tel. Co.* (1979) 24

Proc., § 1094.5, subd. (c)), establishes as a matter of law the Honey Springs project is "urban" development in context of the issues presented. Even though the record amply supports the Board's finding the project consistent with the San Diego County General Plan and the Jamul/Dulzura subregional plan, that issue, indeed that finding, is not in controversy. Rather, our issue is whether substantial evidence supports the Board's determination the project is not an urban development *as that term is used by the applicable state statutes.* We conclude Presenting's reliance upon essentially the residential density of the project, the portion of land to be dedicated to permanent open space, statements regarding environmental preservation and the rural character of the project within its own planning reports, and the consistency of the project with the governing local plans, is misplaced.

Evaluating this proposed, thousand-resident community by the considerations we find relevant, the evidence in this record establishes as a matter of law the proposed Honey Springs project is "urban." It will include 389 luxury homes and 8 acres of commercial services. Although the residential density is 5.2 acres per dwelling unit, the average residential lot is approximately 1.4 acres in size and the lots cover 553 acres distributed primarily on the ranch's hills, ridges and peaks. The development entails approximately 15 miles of roads, a fire station, equestrian facilities, a sewage plant, a public water system, and a commercial service center approved without limitation as to the size or number of commercial buildings. The planned commercial uses include a convenience store, a membership club, a restaurant (indoor and outdoor dining), a cocktail lounge, health spa, dry cleaners, homeowners association, real estate sales, outdoor tennis courts, a pro shop, a service station, a boat rental office, security facilities, a beach, pool and recreational facilities. The project requires importing water through a 12-mile main, with attendant pumping facilities and storage tanks, and a sewage treatment plant with the capacity to process .12 million gallons per day to be built on a 3-acre pad. Inevitably, projects of this magnitude affect and alter the open space and rural character of surrounding areas, regardless of what efforts are made to preserve the environment and the amount of land dedicated to open-space use. Even casting aside the substantial excavation required for development of the roadways and the housing sites, the project involves substantial environmental impact offensive to the rural environment including the visual impact of the project's sewage plant constructed adjacent to Honey Springs Road; the admitted potential that increased runoff could cause extensive downstream erosion even if effective erosion control measures are taken at the construction site within the draft EIR; the numer-

Cal.3d 458, 491 [156 Cal.Rptr. 14, 595 P.2d 592], quoting *DiGiorgio Fruit Corp.* v. *Dept. of Employment* (1961) 56 Cal.2d 54, 61-62 [13 Cal.Rptr. 663, 362 P.2d 487]; *DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 19 [194 Cal.Rptr. 722].)

ous environmental impacts of the residents' 2,723 average daily automobile trips, quadrupling the present traffic burden on Honey Springs Road; the inevitable impact upon wildlife; and the aesthetic impact of a clustered housing tract accompanied by a commercial center and the necessary service facilities. The project will substantially burden existing public services, as it will bring into the school districts approximately 292 students; it will extend to some degree the fire and police responsibilities of adjacent urban areas; and the extension of all utilities to the project area, illustrated by the installation of a 12-mile water pipeline.

Finally, we consider the growth-inducing effect of the proposed project. In a letter to the Board dated November 20, 1981, OPR characterized the Honey Springs project as representing a "leapfrog" development situated in an area not currently serviced by existing facilities making it inconsistent with the "urban strategy report, a policy document which encourages development contiguous to existing urban boundaries and discourages the premature development of agricultural lands when possible." Inevitably, extending existing services and the creation of new service promotes additional development, while the influx of new residents to the area creates growing demands for shopping areas, gas stations and services characteristic of an urbanized area. Accordingly, upon considering the cumulative impact on public services (e.g., schools, fire, police and emergency), the magnitude of the proposed project, the necessity to import water, the necessity to extend basic utility services, the inevitable environmental and visual impacts upon the open space, the residential lot size, the length and width of 15 miles of paved streets, the amount of traffic generated potentially causing the necessity of widening the main road to the area, the multi-planned commercial center, the residential character of the proposed clustered development and its relationship and compatibility with open space values in the surrounding area, we conclude the Honey Springs project is manifestly urban in character.

THE MATTER MUST BE REMANDED SO THE BOARD MAY DETERMINE WHETHER THE PROJECT SATISFIES THE CONTIGUITY REQUIREMENT

However, even though the Honey Springs project is an "urban development," cancellation of the contracts is permitted if the contiguity requirement is satisfied. Respondents argue the record shows the Honey Springs development corresponds to present developmental patterns on contiguous and neighboring lands, noting that there are more than 200 homes in the area. They urge the Board found contiguity when it adopted, without discussion, two subfindings stating: "[T]he land is a logical site for the location of rural development . . . ." And, "[t]he County General Plan [fn. omitted]

. . . prescribes the location of urban development." (Public Ex. A, Findings 1.A and 1.B.)[25] The former was followed by the following language: "[T]he proposed project will produce, within the forseeable future a contiguous pattern of development within the Jamul/Dulzura Subregion . . . ." (*Ibid.*)

 Although the Board facially made the necessary finding,[26] it did so perfunctorily without defining its analytical base, making it impossible for us to review the record to determine whether substantial evidence supports it. Implicit within a review of the Board's action pursuant to Code of Civil Procedure section 1094.5 is the requirement that it set forth factual findings sufficient to bridge the analytic gap between the raw evidence and the ultimate decision. (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12].) There are none in this record; however, neither Presenting nor the Board had the benefit of our analysis to use in factually determining the developmental character of the proposed site's surrounding areas. Moreover, the record shows the "finding" was made without discussion or deliberation and thus does not show the Board's analytical route from evidence to finding. (See *In re Pipinos* (1982) 33 Cal.3d 189, 202 [187 Cal.Rptr. 730, 654 P.2d 1257].) Under these circumstances, "even the existence of substantial evidence to support a necessary determination would not compel a conclusion that the determination was in fact made. The substantial evidence test compels courts only to sustain existing findings supported by substantial evidence, not to hypothesize new findings." (*Sierra Club* v. *City of Hayward, supra,* 28 Cal.3d 840, 859.)

We have examined the record carefully and are satisfied it presently contains little, if any, evidence to suggest the Board could have factually supported a finding that the project meets the statutory requirement of contiguity. We remand to the Board for it to determine whether the project satisfies the contiguity requirement and to hold new hearings and take additional evidence on this issue if it chooses to do so.

### Disposition

The judgment is reversed and the cause remanded to the superior court with directions to issue a writ of mandamus requiring the Board to vacate

---

[25]Buried within the latter, it is interesting to note the circular argument: "The cancellation and alternative use could not result in discontiguous patterns of urban development because urban development patterns are prohibited in the vicinity of Honey Springs by the County General Plan."

[26]As already noted, the Board adopted the subfinding without discussion after failing to address the issue of contiguity at the February 17, 1982, hearing on the cancellations, believing the contiguity issue was moot due to its characterization of the project as "rural" rather than "urban" in nature.

its cancellation of the Williamson Act agreements and to conduct such further proceedings as it deems appropriate consistent with this opinion.

Butler, J., concurred.

**LEWIS, J.** *—I respectfully dissent.

The Board of Supervisors of San Diego County determined that respondent Real Party in Interest was permitted to cancel the agricultural and open space preserve contracts pertaining to the respondent's land, under the "window" provisions of the Robinson Act amendments to the Williamson Act, and to proceed with development of their property based on a finding the planned development would not "create discontiguous patterns of urban development." There is no question but what this finding, if proper, is a valid basis of the board's action.

The Board's finding the development would not "create discontigous patterns of urban development" is based on a finding the planned development is "rural" in nature and therefore by definition not "urban." The majority of this court determine the planned development is in fact urban. The proposed development, having been scaled down from 862 dwelling units to 389 units to comply with the "multiple rural use density limitations of the Jamul-Dulzura Subregional Area Plan," has a density of .18 units per acre or 5.2 acres per unit, with actual lot sizes ranging from 1 acre to 2.5 acres and more than 40 percent of the land dedicated as permanent open space, and up to 90 percent of the 2,022 acres retained or restored to a natural rural appearance. The development will include related commercial, service and recreational facilities. As proposed, the project does qualify as "multiple rural use" according to the subregional area plan, and the comprehensive general plan as adopted by the San Diego County Planning Commission and San Diego County Board of Supervisors.

It is plain under these statutes the Legislature has left to local government agencies the land use determinations of what is "urban development" and what is not. It also seems plain "rural" development is not "urban" development. What the planning commission and board of supervisors find to be "urban" or "rural" may not be quite the same in Sierra, Shasta, or Siskiyou as in San Francisco, Sacramento or San Diego. That would seem to be exactly why local governments should be permitted to make these land use decision in terms consistent with their other land use decisions and with

*Assigned by the Chairperson of the Judicial Council.

the terms of their locally adopted land use regulations, plans, and ordinances.

I would suggest the court should refrain from defining "urban" or "rural" in different terms or by different standards than those adopted after extensive public hearings by the elected supervisors on the recommendation of the planning commission and with the advice and participation of local planning groups. Even though some judges might have backgrounds in local agency law or land-use regulation, that is not the qualification of office or the profession of the courts. The particular decisions about what is "rural" or "urban" in particular counties is, in the area of land use, left, and properly so, to different planning commissions and boards of supervisors rather than to different courts. I suggest the court's review of this case should be confined to determining whether by the duly considered and adopted land use regulations of San Diego County, the board's decision the project is "rural" and not "urban," and therefore not the prospective cause of "discontiguous urban development" is supported by the evidence. By this standard of review the decision of the trial court upholding the action of the board of supervisors should be affirmed.

Petitions for a rehearing were denied July 19, 1984. Lewis, J.,* was of the opinion that the petitions should be granted. The petitions of all respondents for a hearing by the Supreme Court were denied September 27, 1984. Kaus, J., and Grodin, J., were of the opinion that the petitions should be granted.

---

*Assigned by the Chairperson of the Judicial Council.